## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| FENTON WHELAN LIMITED and 21 GP LIMITED,    )<br>)<br>)<br>Plaintiffs,    )<br>)<br>v.    )<br>)<br>THE CLEVELAND CLINIC FOUNDATION,<br>WILLIAM PEACOCK, DENNIS LARAWAY,<br>and JORGE "PAT" RIOS,    )<br>)<br>Defendants.    )<br>) | Case No.  1:25-cv-00275<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, Fenton Whelan Limited ("FWL") and 21 GP Limited ("21 GP") (together, "Fenton"), by and through their undersigned counsel, for their Complaint against Defendants, The Cleveland Clinic Foundation ("the Foundation"), William Peacock ("Peacock"), Dennis Laraway ("Laraway"), and Jorge "Pat" Rios ("Rios"), complain and allege as follows:

### Introduction

1. Plaintiffs bring this action to recover millions of dollars in damages caused by the bad faith conduct of the Foundation and its executive leadership team, including its Chief Operating Officer Bill Peacock, its Chief Financial Officer Dennis Laraway, and its U.S. Global Head of Real Estate and Construction Jorge "Pat" Rios.

2. In spring 2023, Fenton, a real estate development company based in London, and the Foundation, with its subsidiary Cleveland Clinic London Ltd. ("CCL") (together, "Cleveland"), began negotiations to jointly develop a cancer center (the "Project") in a commercial property located at 21-24 Grosvenor Place in central London (the "Property"), next door to the Cleveland Clinic London Hospital.

3. The general framework of the transaction was for Fenton to structure the purchase and development of the Property, which CCL would acquire and occupy ("Transaction"). In anticipation of such a transaction, in January 2024, Plaintiff 21 GP (a Fenton subsidiary) entered into an agreement to purchase the Property from its owner MeAg Munich ERGO ("MeAg") for $78 million (the "MeAg Agreement"). As part of the purchase contract, Fenton put down a non-refundable $7.8 million cash earnest money deposit. The deadline to close on the purchase of the Property was May 15, 2024. If the purchase did not close, Fenton would forfeit the deposit. Third-party financing for the purchase was contingent on Fenton obtaining an agreement to lease with CCL or another operator.

4. At the end of 2023, after signing a term sheet and three months of further negotiations, Cleveland had broken off discussions with Fenton and had attempted to go behind Fenton's back to purchase the Property directly from MeAg. This bad faith approach was rebuffed by MeAg. Cleveland then came back to the table with Fenton. Cleveland, including the Foundation and all individual defendants, were fully aware of the terms of Fenton's purchase agreement with MeAg, including the $7.8 million non-refundable cash deposit that Fenton put down to secure the purchase and the May 15, 2024, closing deadline.

5. Cleveland, including all Defendants, knew that Fenton had been in negotiations with other potential development partners prior to its discussions with Cleveland. Cleveland expressed its strong desire that Fenton negotiate exclusively with Cleveland. Fenton, however, needed a commitment from Cleveland to proceed with negotiations in good faith before Fenton would agree to negotiate and finalize the deal with Cleveland. If Cleveland was not going to proceed in good faith, Fenton would need to secure an alternative partner to develop the Property such that it could complete its purchase of the Property under MeAg's deadline and not lose its

2

$7.8 million deposit. Accordingly, Fenton demanded assurances from the Foundation that Cleveland would proceed with the negotiations in good faith to their final conclusion.

6.      In response to Fenton's demand that Cleveland proceed toward a final deal in good faith, on March 22, 2024, less than two months before the deadline to close on the purchase of the Property, the Foundation's COO and CFO, Defendants Peacock and Laraway, jointly sent an email to Fenton where they stated that the Property "is the location and project pathway that best fits our strategy and needs of the enterprise," agreed "to progress the contractual documentation for [the Property]," and confirmed that Cleveland wanted to proceed "to deliver a cancer centre at [the Property]." While this email stated there was no "binding commitment" until the transaction documents were finalized and internal approvals were obtained, the Foundation's and the individuals' words and actions created a binding agreement and obligation to negotiate in good faith. The Foundation also knew that Fenton was required to close on the deal with MeAg in less than two months, and that by inducing Fenton to proceed with Cleveland—to the exclusion of all others—in the short time remaining before MeAg's deadline, Fenton would be unable to secure a deal with another partner and would lose its nonrefundable $7.8 million deposit in addition to the time and money Fenton spent on the design, as well as its reasonably certain and foreseeable lost profits.

7.      By mid-April 2024, the deal structure and all material terms had been agreed to by the parties and extensive work had been done on the design. The parties scheduled a final contract drafting session for April 26, 2024. The parties agreed to close the Transaction by May 15, 2024, and they scheduled a closing dinner for the night before, on May 14, 2024.

8.      The Foundation and the individual defendants, however, did not proceed in good faith. On April 25, 2024, **the day before the final contract drafting session was scheduled to**

**take place** and just three weeks before the parties were scheduled to close the Transaction, the Foundation, by and through its officers and senior leadership, Peacock and Rios, summarily terminated the deal with no warning, explanation, or business justification. The Foundation, the individual defendants, and even the Foundation's CEO, then ghosted Fenton, refusing to return Fenton's calls and emails seeking to re-engage in the negotiation, or at the very least provide an explanation of what happened and why.

9.     As a result of Defendants' conduct, Fenton was unable to find an alternative partner for the development of the Property, was unable to secure financing to complete the purchase of the Property, and forfeited its $7.8 million cash earnest money deposit. Fenton also suffered damage through the design work it had already completed in reliance on Defendants' conduct and their commitment to negotiate in good faith, as well as reasonably certain and foreseeable lost profits.

10.     Several months after Cleveland summarily terminated its deal with Fenton in bad faith without reason or justification, Cleveland entered into a term sheet for a transaction to develop a cancer center at a different building down the street from the Property.

11.     By unilaterally scuttling the deal, the Foundation was able to keep a competing healthcare provider from partnering with Fenton and moving in next door. It also apparently was able to continue negotiating a deal on at least one other property, while tying up the Property to use as a back-up option if the other deal fell through—ultimately sticking Fenton with the losses.

12.     To recoup its recoverable losses, Fenton brings this Complaint against the Foundation to assert the following claims under Ohio law: (1) breach of contract, (2) promissory estoppel, (3) intentional interference with contract, (4) tortious interference with business relationship with respect to Fenton's relationship with CCL; (5) tortious interference with business

4

relationships with respect to Fenton's relationship with CBRE and MeAg; and (6) unjust enrichment.

## Parties

13.     Plaintiff FWL is a private limited company in England, registered at 37 Upper Brook Street, London, W1K7PR. Its principal place of business is in London, England.

14.     Plaintiff 21 GP is a private limited company in London, England, registered at 37 Upper Brook Street, London, W1K7PR. Its principal place of business is in London, England. FWL formed 21 GP to develop the Property.

15.     Plaintiffs are wholly owned by private individuals. None of Plaintiffs' equity holders are residents of Ohio.

16.     Defendant the Foundation is a non-profit corporation with its principal place of business in Cleveland, Ohio.

17.     Defendant Peacock is, upon information and belief, a resident of Ohio. Defendant Peacock is, and was during all relevant times, the Chief Operating Officer of the Foundation and a member of the Foundation's executive leadership team.

18.     Defendant Laraway is, upon information and belief, a resident of Ohio. Defendant Laraway is, and was during all relevant times, the Chief Financial Officer of the Foundation and a member of the Foundation's executive leadership team.

19.     Defendant Rios is, upon information and belief, a resident of Ohio. Defendant Rios was, during all relevant times, the U.S. Global Head of Real Estate and Construction of the Foundation and a senior executive of the Foundation. During the relevant period, Defendant Rios was intimately involved in the Transaction.

**Jurisdiction and Venue**

20.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.

21.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) because (1) Plaintiffs and Defendants have diverse citizenship as set forth above and (2) the amount in controversy exceeds $75,000.

22.     This Court has jurisdiction over the Defendant Foundation as it is doing business in the state of Ohio, is qualified to do business in the state of Ohio, maintains its principal place of business in the state of Ohio, and because events that form the basis of this action occurred in Ohio.

23.     This Court has jurisdiction over Defendants Peacock, Laraway, and Rios because they are residents of the state of Ohio, work for the Foundation, and because events that form the basis of this action occurred in Ohio.

24.     Venue is proper in this district and division pursuant to 28 U.S.C. § 1391(b)(1) because the Defendant Foundation is a resident of the state of Ohio and has its principal place of business within this district and division, and because, upon information and belief, Defendants Peacock, Laraway, and Rios reside and work in Ohio.

25.     As alleged herein, the conduct giving rise to the injury sustained by Plaintiffs occurred in this district and division, including but not limited to in-person negotiations between the parties at the Foundation's home office in Cleveland, Ohio.

26.     Key witnesses in this case reside in Ohio, including the individual Defendants, members of the Foundation's executive leadership team, members of the Foundation's Board of Directors, the Foundation's design team, and other employees of the Foundation.

**Background**

A.    **Fenton Prepares to Acquire and Develop the Property.**

27.    FWL is a property development and design business based in London.

28.    In or around November 2022, Fenton representatives learned that the Property, a commercial building ideal for housing a medical center, would be for sale. Given the Property's location and design structure, Fenton immediately recognized the Property's value as potential real estate development investment opportunity.

29.    Fenton entered into discussions with the Property's owner, MeAg, regarding the purchase and development of the Property. As a product of these negotiations, in March 2023, 21 GP obtained exclusive rights to purchase the Property from MeAg.

B.    **Fenton Begins Discussions with Cleveland in Spring of 2023.**

30.    Fenton was initially exploring a transaction whereby it would partner with a Turkish hospital that planned to convert the Property into its U.K. flagship medical center. Fenton also was exploring opportunities with other parties and investors in the healthcare industry, including various hospitals, medical centers, and investors from around the world.

31.    In the spring of 2023, Fenton entered into negotiations with Cleveland.

32.    Because the Property was adjacent to the Cleveland Clinic London Hospital, both Fenton and Cleveland recognized that it would be an ideal location for Cleveland to operate a medical center. Cleveland told Fenton that it was interested in partnering with Fenton to develop the Property as a cancer treatment facility.

33.    CCL is owned by the Foundation, a non-profit corporation that prides itself on delivering the highest quality of care to patients across the world, while exercising the highest level of business ethics. As a founding member of the Northeast Ohio Business Ethics Coalition,

the Foundation signed a pledge to codify its "commitment to business ethics" and to "dedicate [itself] to becoming leaders for positive efforts in the business community."[1] Among other things, the Foundation pledged to "maintain a 'Tone at the Top' of ethical business conduct, by which ownership and upper management in the company will make ethical business practices a priority." The Foundation further affirmed: "This organization rejects corruption and unethical conduct in its business affairs and it urges others to do the same. We believe it is important both to speak out against such conduct and to lead by example. We are committed to doing both on our own and by working with others to lead efforts to foster greater ethical conduct in this community."

34.    At the time these negotiations began, Fenton was aware of Cleveland's reputation for quality care and ethical business practices, and believed Cleveland would be acting in good faith, consistent with this reputation and pledge.

35.    In April 2023, Fenton representative Sanjay Sharma spoke with the CCL Chief Operating Officer, Lindsey Condron. Soon after, Fenton provided Cleveland with preliminary proposed terms.

36.    In May 2023, FWL and CCL entered into a nondisclosure agreement and began negotiating a development deal. The parties initially targeted June 27, 2023 (the date Fenton's exclusivity with MeAg was due to expire) as the date to sign a term sheet, but CCL asked to extend that date.

37.    On or around July 18, 2023, Defendant Laraway visited London and toured the Property with Fenton representatives.

---

[1] A copy of a Membership Pledge for The Northeast Ohio Business Ethics Coalition is available at https://my.clevelandclinic.org/-/scassets/files/org/about/neobe/pledge.pdf?la=en (last accessed Feb. 12, 2025).

38.     Fenton then began extensive work to show Cleveland that the Property could be developed to suit Cleveland's needs.

39.     On September 15, 2023, 21 GP (through its wholly-owned subsidiaries 21 G Nominee 1 Limited and 21 G Nominee 2 Limited) and CCL signed Heads of Terms, which contained detailed terms relating to the purchase and development of the Property. Fenton agreed to negotiate exclusively with Cleveland.

40.     On October 16, 2023, the Foundation's global CEO, Dr. Tomislav Mihaljevic, visited London and toured the property with Fenton representatives.

41.     Over the next three months, Fenton and Cleveland engaged in extensive negotiations regarding the purchase and development of the Property. Fenton invested significant time and resources into the Project, including third-party architect and design fees.

42.     During this negotiation period, Cleveland requested that 21 GP extend the exclusivity period multiple times. 21 GP accommodated Cleveland's extension requests because Fenton believed Cleveland was acting in good faith in pursuing the Transaction, consistent with Cleveland's assurances and its pledged commitment to ethical business practices.

43.     In December 2023, despite months of negotiations, Cleveland unexpectedly withdrew from discussions regarding the purchase and development of the Property. Cleveland predicated its withdrawal on Fenton's alleged financing concerns. However, these concerns were just pre-text. Cleveland's real reason, as discussed in further detail below, reflects Cleveland's bad faith in finalizing any agreement to complete the Transaction.

**C.      21 GP Enters into an Agreement to Purchase the Property from MeAg.**

44.      In early January 2024, Fenton representatives learned from its commercial real estate broker Cushman Wakefield that, after Cleveland abruptly ended discussions with Fenton, Cleveland approached MeAg directly about buying and developing the Property without Fenton.

45.      By cutting Fenton out of the project, and working with MeAg directly, Cleveland attempted to leverage and reap the benefits of the substantial investment and contributions that Fenton had already made to the Project, leaving Fenton with nothing. Cleveland, however, was unable to complete a deal for the purchase of the Property with MeAg.

46.      Regardless of the status of its negotiations with Cleveland, recognizing the Property's extraordinary value proposition, Fenton decided to purchase the Property. On December 20, 2023, 21 GP entered into the MeAg Agreement.

47.      Under the MeAg Agreement, 21 GP agreed to purchase the Property for a price of £61,610,600 (approximately $78 million) by May 15, 2024. Under the Agreement, 21 GP paid a non-refundable deposit of £6,161,060 (approximately $7.8 million) to secure the Property.

48.      Under the terms of the MeAg Agreement, if 21 GP failed to fund the Property purchase by May 15, 2024, 21 GP would be in breach of the MeAg Agreement and, as a consequence, would lose its £6,161,060 deposit and all other money and resources expended on the Project, as well as its anticipated profits.

49.      Based on its extensive contacts with investors and health systems worldwide, its previous discussions with potential partners, and its expertise in the real estate market, at the time it entered into the MeAg Agreement, Fenton was confident it would find a partner and structure a development deal by the May 15, 2024, deadline.

**D.      Cleveland Decides to Move Forward with a Development Deal.**

50.     After learning that 21 GP had entered into the MeAg Agreement and that the Foundation's attempt to circumvent Fenton had failed, Cleveland asked to re-start discussions with Fenton regarding the purchase and development of the Property.

51.     During a meeting held on or around January 19, 2024, in CCL's offices, Cleveland representatives informed Fenton of the Foundation's extraordinary ethical standards, extolling itself on that basis. CCL President Dr. Rob Lorenz also expressed that frank and honest communication between Fenton and Cleveland with respect to the Project was essential, comparing the relationship to that of surgeon and patient.

52.     As a condition of continuing the parties' discussions, representatives from the Foundation insisted that representatives from Fenton travel to Ohio to meet with the Foundation's U.S. executive leadership team. Cleveland made clear that it would only engage in discussions if Fenton agreed to meet with the Foundation's executive leadership in Cleveland, Ohio.

53.     Even while Fenton was planning its visit to Ohio, CCL representatives in London actively re-engaged in preparing for the Transaction, participating with Fenton in document revisions and stating that no other sites were under serious consideration for development of the cancer center.

54.     On February 21, 2024, Fenton representatives Sanjay Sharma and James Van Den Heule traveled to the Foundation's home offices in Cleveland, Ohio, and met with, among others, Foundation officer Defendant Laraway, Foundation officer Defendant Peacock, and Foundation executive Defendant Rios.

55.     During those meetings, Mr. Sharma stated explicitly that the Foundation needed to commit to the Project by mid-March 2024. Also, during those meetings, Defendant Laraway

aggressively quizzed Mr. Sharma on what Fenton would do if Cleveland did not proceed with the Project. Mr. Sharma explained that Fenton would find another partner to develop the Property but required sufficient time to do so, especially due to the bespoke nature of the design plans and finance structure of the MeAg Agreement, both of which had been developed for CCL. Mr. Sharma further stated that if Fenton did not have a commitment from the Foundation by that time, Fenton would need to use the next two months to secure another development partner and fund the Property purchase by MeAg's deadline. Mr. Sharma explicitly stated that the deadline for the Foundation to commit was not negotiable and that Fenton could not wait for Cleveland any longer.

56. The next morning, while still in Cleveland, Ohio, Fenton representatives again advised CCL President Dr. Robert Lorenz, CCL Chief Operating Officer Lindsey Condron, and Defendant Rios that within one month at the latest, Fenton needed a commitment that Cleveland intended to proceed with the Project. Ms. Condron noted she thought yesterday's meeting had gone well, and Dr. Lorenz asked what he could do to assist Fenton in delivering Cleveland's cancer center. Mr. Sharma replied, essentially, "Give me your commitment."

57. Over the next month, Cleveland and Fenton continued discussions regarding the Property. Cleveland continued to express interest and took actions that demonstrated its ongoing interest. For instance, Defendant Rios and Ms. Condron granted Fenton authorization to submit a planning application for the Project.

58. Cleveland, including all Defendants, knew that with the MeAg Agreement's May 15, 2024, deadline approaching, Fenton was also in discussions with other development partners including multiple potential operators and funders.

59.     By March 11, 2024, Cleveland still had not fully committed to the Project. Acutely aware of the approaching deadline, Mr. Sharma wrote to CCL's CFO, Michael Herb, to demand confirmation that Cleveland intended to move forward with the Project.

60.     Mr. Sharma also informed Mr. Herb that another potential project partner had already cleared MeAg's Know Your Customer ("KYC") process. CCL responded by providing its own KYC documentation three days later.

61.     In mid-March, Mr. Herb asked to meet with Fenton. On March 18, 2024, Fenton representatives met with Mr. Herb at Fenton's offices.

62.     At that meeting, Mr. Herb indicated that, over the past few months, Cleveland had also been looking at other properties in London to potentially house the cancer center. Mr. Herb stated, however, that he considered the other properties to be backup only, and that Cleveland had decided and was committed to move forward with developing its cancer center at the Property.

63.     Mr. Sharma told Mr. Herb that Fenton required a commitment in writing from the **Foundation's U.S. leadership team by March 22, 2024**. Mr. Sharma explicitly stated that if Fenton did not have that commitment, Fenton would need to end negotiations with Cleveland to pursue an alternative partner. Mr. Sharma emphasized that the commitment must come from the U.S. leadership team. Mr. Sharma stated that Cleveland would be its preferred partner, but also made it clear that 21 GP was in danger of losing its $7.8 million deposit with MeAg, and that **if the Foundation did not commit by March 22, 2024, Fenton would need all of the remaining time to find a new partner and complete an alternative transaction by the May 15, 2024 deadline**.

64.     Mr. Herb agreed to obtain written commitment from the Foundation.

     **E.**       **The Foundation Agrees to Negotiate in Good Faith to Finalize the Transaction and Deliver the Cancer Center at the Property.**

65.     On March 22, 2024, Defendant Peacock sent an email on behalf of himself and the Foundation's CFO, Defendant Laraway, to Mr. Sharma. The email, a true and accurate copy of which is attached to this Complaint as **Exhibit A**,[2] stated:

> "On behalf of myself and [Defendant Laraway] we are proposing that the [Foundation] and CCL teams re-engage with you to progress the contractual documentation for [the Property]. We consider that [the Property] is the location and project pathway that best fits our strategy and needs of the enterprise, however, you will appreciate that we are not in a position to enter into any binding commitment until such time as the transaction documents are agreed and we have obtained the final internal approvals.
>
> Please provide us with your confirmed interest to re-engage activities to finalize terms for [the Property].
>
> Best regards,
> Bill Peacock and Dennis Laraway"

66.     The same day, Mr. Sharma responded:

> "Hi Bill, Thanks for the note below. We confirm [Fenton] would like to proceed with CCL to deliver a cancer centre at [the Property]. I look forward to working with your team to finalise the deal and deliver the facility."

67.     Mr. Peacock replied:

> "Thank you for your confirmation Sanjay. We will be in touch early this week to lay out our diaries."

68.     Through this email, Defendant Peacock and Defendant Laraway agreed to the following:

       a.     The Property is "the location and project pathway that best fits our strategy and needs;"

---

[2] For privacy purposes, all exhibits have been redacted to conceal the email addresses and telephone numbers of individuals.

b.      Cleveland would move forward "to progress the contractual documentation for [the Property];" and

c.      In response to Mr. Sharma's second email, Cleveland confirmed Mr. Sharma's statement that "[Fenton] look[ed] forward to working with [Cleveland's] team to finalize the deal and deliver the facility."

69.     With the Foundation's agreement in place, Fenton understood from this email chain that Cleveland was pursuing the Property exclusively, and that Cleveland intended to work in good faith to finalize the Transaction.

70.     Further, the email chain confirms Mr. Herb's previous statement that while Cleveland had at some point been considering an alternative site for its medical center, Cleveland had decided to move forward with the Property.

71.     Defendants Peacock and Laraway knew that this email exchange, along with Defendants' other statements and conduct described herein, as well as the Foundation's stellar reputation in the business and healthcare industry, would cause Fenton to stop looking for other partners and forgo its remaining opportunities to proceed with an alternative transaction.

72.     Understandably, in light of Cleveland's pledge and stated commitment to conduct itself ethically, Fenton believed that Defendants Peacock and Laraway were acting in good faith as the law requires during these discussions. In reliance on the Defendants' representations, which were supported by the Foundation's conduct in pursuing the Project, Fenton did not pursue an alternative partner and invested all of its time and resources into finalizing the Transaction with Cleveland.

73.     Had Defendants Peacock and Laraway not sent the March 22 email, Fenton would have pursued an alternative development partner to close a deal with MeAg for the Property.

**F. Fenton and Cleveland Work Diligently to Complete the Transaction.**

74. Over the next month, Fenton and Cleveland worked intensively to complete the Transaction by May 15, 2024.

75. Between March 22 and April 24, 2024, Fenton and Cleveland, including Defendant Rios, had many legal and accounting calls with outside advisors, had agreed on all material terms, and had nearly finalized the Transaction documents. The documents were so far along that the parties scheduled an all-hands in-person drafting session at CCL's offices for April 26, 2024, to finalize the documents.

76. The parties also re-started the formal weekly design team calls and conducted site visits to fit the building to CCL's specifications. Representatives of Fenton, Cleveland, and others participated in design-related meetings on at least the following dates: March 21, March 27, March 30, April 3, April 10, April 17, April 23, and April 24. Participants in those meetings included Cleveland representatives Defendant Rios, Lindsey Condron, Upesh Dhanji, Michael Herb, and Evan Langhorst; Fenton representatives James Van Den Heule, Max Duffy, and Sanjay Sharma; as well as representatives of mechanical and electrical engineers Hoare Lea LLP, architects Fred Pilbrow & Partners Ltd., specialist healthcare practice CSM Architects, and structural engineers AKT II, among others. Numerous additional meetings were held by smaller groups to focus on detail design matters.

77. Between meetings, Fenton and CCL exchanged frequent correspondence and detailed project materials reflecting floor plans and other design elements.

78. At Cleveland's request, Fenton oversaw modification of the Project plans to accommodate the addition of a third Linac (or linear accelerator, which is a large piece of medical

equipment used to deliver radiation treatment to cancer patients). This was a major redesign and significant expense to Fenton.

79.     Cleveland also requested, and Fenton accordingly performed, intrusive structural testing at the Property, including digging into the basement and exposing and testing steel beams—all of which returned satisfactory findings.

80.     The costs for these third-party professional services were borne by Fenton, in reliance on the Foundation's promise to move forward with finalizing the Transaction.

81.     As of the afternoon of April 24, 2024, CCL was still fully engaged and committed to completing the transaction. That day, representatives from Fenton, CCL, and other firms involved in the design process participated in a group call to continue the design process. During the call, Ms. Condron (CCL's COO) stated she scheduled a meeting for April 26, 2024, to discuss the Project with the global oncology team. CCL's Director of Design, Upesh Djandi, also attended that call and agreed that the layouts would likely not be subject to major changes, and agreed to target May 15, 2024, as the date to freeze the layouts. Later that day, Mr. Djandi sent updated drawings, with the note "Happy to jump on a call at any point to discuss further or to review any updates as layouts are developed." These were clear indications that CCL was committed to completing a deal.

82.     On April 24, 2024, Evan Langhorst, lead designer on the Project for the Foundation, sent an email, a true and correct copy of which is attached as **Exhibit B** to this Complaint, requesting to schedule a meeting with Fenton and other third-party design professionals for April 30, 2024, to coordinate the "design programme, including milestones, signoff and freeze dates, and design responsibilities." He specifically asked the Fenton team to send the "updated

17

programme this Friday [April 26, 2024] so we have time to review and provide feedback at next Tuesday's meeting."

83.     As of April 24, 2024, there was absolutely no indication whatsoever from CCL or the Foundation or the individual defendants that Cleveland would be withdrawing from the Transaction. Every indication, through the words and conduct of Cleveland, as it had been since the March 22, 2024, email, was that Cleveland was working in good faith and committed to the project.

84.     As further evidence of CCL's intent to complete the Transaction, Dr. Robert Lorenz (CCL's President) invited Mr. Sharma and Mr. Van den Heule to a closing dinner on May 14 to celebrate, and Mr. Herb (CCL's CFO) and Ms. Condron (CCL's COO) planned to attend a tennis tournament as guests of Fenton in June.

85.     All other conditions and requirements were on track to be satisfied by the closing deadline.

**G.      Without any Warning, Notice, or Justification, the Foundation Blocks the Transaction.**

86.     On April 25, 2024, **the day after the extensive design team call, and the day before the final drafting session was to take place**, Defendant Peacock and Defendant Rios scheduled a video conference with Mr. Sharma, on just a few hours' notice.

87.     During that call, which lasted approximately five minutes, Defendant Peacock and Defendant Rios informed Mr. Sharma that the Foundation's executive leadership had decided not to proceed with the Transaction.

88.     Mr. Sharma was shocked by this news. Cleveland gave no prior warning of this decision. Until that moment, Cleveland had demonstrated unequivocally that it would be ready to close the Transaction by the May 15 deadline.

89.     Mr. Sharma demanded an explanation, but Defendant Peacock and Defendant Rios did not provide **any** reason for the Foundation's sudden decision to terminate the Project, and refused to discuss alternative plans. After the call ended, despite repeated attempts to contact the Foundation, Mr. Sharma would never hear from Defendant Peacock, Defendant Laraway, Defendant Rios, or any other principal of the Foundation again.

90.     Just hours after the video conference with Defendants Peacock and Rios, Fenton's counsel received an email from Cleveland's attorneys at the law firm Clifford Chance emphasizing the "unfortunate" nature of Cleveland's decision, and acknowledging that Cleveland was aware throughout that Fenton had ceased engagement with other parties in reliance on Cleveland's assurances and conduct:

> "As you may have heard, Cleveland has unfortunately withdrawn from the proposed transaction. As you know, the proposed transaction was subject to contract and board approval. Unfortunately, our client's executive leadership has decided not to proceed. There are also still very material commercial points on the contract and structuring outstanding. As Sanjay has mentioned both to Cleveland and on calls, [Fenton] has been in discussion with other interested parties and operators, so Cleveland wanted to let [Fenton] know it's position as soon as possible to give [Fenton] the opportunity and sufficient time to re-engage with those parties."

A true and correct copy of this email is attached to the Complaint as **Exhibit C**.

91.     This email misrepresents the following facts:

a.     First, there were no "material commercial points on the contract and structure outstanding." The structure of the Transaction and all material terms had been decided. The contracts were nearly complete, and were scheduled to be finalized in an all-hands drafting session **the next day**.

b.     Second, Fenton could not simply "re-engage" with "other interested parties and operators." The Foundation knew—from Mr. Sharma—that the time for Fenton to find an alternative partner had long passed, and that 21 days was not sufficient time for Fenton to negotiate,

structure, and finalize a new transaction for the purchase and development of a $78 million property with a new partner. This email shows that Cleveland knew Fenton had had discussions with other potential partners, but had dis-engaged with those parties and put those discussions aside so it could complete the Transaction with CCL.

92.     Since April 25, 2024, the Foundation has refused to provide any explanation for its decision. The April 25 video conference was the last communication that Fenton received from anyone at Cleveland. After that call, Mr. Sharma reached out multiple times to Cleveland representatives, including Dr. Tom Mihaljevic, Dr. Robert Lorenz, Lindsey Condron, Michael Herb, and Defendants Laraway and Peacock. No representative from Cleveland ever responded. Cleveland's attorneys at Clifford Chance then demanded that Mr. Sharma stop communicating with Cleveland altogether and insisted that all communications be directed to Clifford Chance.

93.     On May 16, 2024, Mr. Sharma sent the following message via email, a true and correct copy of which is attached as **Exhibit D** to the Complaint, to the Foundation's CEO, Dr. Tomislav Mihaljevic:

> Dear Dr Mihaljevic,
>
> I am writing to you regarding the proposed London cancer centre that my firm has been working to deliver alongside your London team and the CCF global design/construction team since April 2023. You will recall we toured the building at 21 Grosvenor Place together last October post your board's approval of heads of terms in September. On March 22nd, your COO and CFO wrote to us (attached) and confirmed your intention to proceed with us.
>
> On Thursday April 25th, after 12 months of engagement and 3 weeks from when we need to complete, I received a request for a Teams call on 2 hours' notice. On that 5 minute call Bill Peacock informed me 'the executive leadership team have decided not proceed with the transaction.' No further explanation was provided.
>
> We were working intensively with your global team the day prior and had scheduled a meeting for the next day at your offices at 40 Grosvenor Place to finalise the legal documentation. After working with them on a weekly basis for

over a year, none will return my calls. None of my attempts to communicate with any team member have been successful.

I was born in Cleveland and both my parents worked at CCF. My mother passed from breast cancer; the chance to deliver a cancer centre for CCL was a dream project for me. I fully expected CCF/CCL to act in good faith and uphold your listed values of integrity and empathy in our dealings.

I cannot understand how CCF's termination with no notice and without explanation coincides with these values. In our January 19th meeting in your London office with Dr Lorenz and Lindsey Condron, we were told that you expected from us total transparency and the highest standard of ethical conduct. Your unexplained withdrawal at such a late stage has left us facing an immediate loss of at least £10 million, which will be absolutely devastating for us and our employees.

Please help us to find resolution. We at least deserve to understand what has led to this cataclysmic decision.

Sincerely yours,
Sanjay

94.     Mr. Sharma never received a response from Dr. Mihaljavic or anyone else at Cleveland. Shortly after, Cleveland's counsel at Clifford Chance sent an email which demanded that Fenton cease attempting to contact Cleveland.

95.     Had the Foundation not agreed to move forward with the Transaction, Fenton would have secured an alternative development partner and satisfied 21 GP's obligations under the MeAg Agreement.

96.     Ultimately, 21 GP was unable to fund the purchase of the Property by May 15, 2024, and lost its £6,161,060 (approximately $7.8 million) deposit under the MeAg Agreement. Fenton also suffered over £1,400,000 (about $1.8 million) in losses from third-party expenses for professional services which were incurred to develop the Property to CCL's specifications. Finally,

Fenton has suffered at least £20,000,000 (approximately $25 million) in reasonably certain and foreseeable lost profits.[3]

**H.      Cleveland Instead Pursues Development of its Cancer Center at 40 Grosvenor Place.**

97.      In the weeks and months after the Foundation blocked the Transaction, Fenton learned that CCL had instead decided to lease new space in a different property, located at 40 Grosvenor Place, to develop the cancer center. This is a large property that housed CCL's offices, but CCL needed to acquire, through a new transaction, and fully develop a new space to build and operate a cancer center. This involved full architecture and design planning, city approvals, excavation, including work to make the historical building functional for radiation therapy, by, for example, adding linear accelerators and building lead walls.

98.      On information and belief, Cleveland entered into a term sheet for development and operation of 40 Grosvenor Place to operate as a cancer center functionally equivalent to what had been contemplated at the Property. On information and belief, 40 Grosvenor Place was one of the properties that Cleveland told Fenton it was considering but had abandoned by mid-March 2024. On information and belief, one other such property was located at 7 Millbank.

99.      Fenton was aware in early 2024 that Cleveland had been simultaneously considering deals on different properties, but Cleveland representatives told Fenton in March 2024 that Cleveland had decided not to move forward with the other properties it had been considering, which included 40 Grosvenor Place, and that Cleveland had decided to move forward with the Property instead.

---

[3] These numbers have been calculated using the exchange rate from May 15, 2024, approximately $1.27 to £1.00.

100.    However, upon information and belief, Cleveland had not actually decided to move forward with the Property when it so represented; rather, it appears that Cleveland was tying up the Property as a "spare," in case another property, such as 40 Grosvenor Place, did not work out.

101.    For a month after the Foundation and Defendants Peacock and Laraway induced Fenton to forego alternative transactions, through representations that Cleveland itself had stopped looking for alternative transactions, the Foundation was in reality trying to reach a deal on at least one other property that would, if completed, eliminate Cleveland's need for the Property.

102.    Upon information and belief, the Foundation deliberately waited until the night before the transaction documents were due to be finalized to notify Fenton that the Foundation would not move forward with the Property.

103.    Furthermore, on information and belief, Cleveland has converted intellectual property and work product funded and delivered by Fenton for its own purposes in connection with the design and anticipated development of a cancer center at 40 Grosvenor Place, without compensation to Fenton. In fact, shortly before Cleveland withdrew from the Transaction, representatives of the Foundation repeatedly asked and ultimately demanded that Fenton provide them with a full set of CAD drawings for the project.

104.    Additionally, Fenton's work demonstrated to Cleveland that a cancer center could be operated in a historical building currently utilized for office space, as both the Property and 40 Grosvenor Place are. Fenton provided, at its own expense, full architecture and design planning, including plans for among other things, adding linear accelerators and lead walls. These plans would be useful for designing the cancer center at 40 Grosvenor Place.

I.      **Fenton's Other Business Relationships Suffer as a Result of Cleveland's Actions.**

105.    CBRE is the world's largest commercial real estate services and investment firm, and a key player in the London market.

106.    Fenton has a long-term business relationship with CBRE and historically has relied on CBRE as an important and trusted partner.

107.    Following Cleveland's withdrawal from the Project at 21 Grosvenor Place, CBRE now refuses to do business with Fenton.

108.    On information and belief, Cleveland has instructed and pressured CBRE not to do business with Fenton.

109.    Fenton worked closely with MeAg for more than a year to deliver the Property for CCL to use as a cancer center. During that time, Fenton built a strong relationship with MeAg.

110.    After the Foundation blocked the Transaction, causing Fenton to default on its obligations to MeAg, MeAg will no longer do business with Fenton.

111.    MeAg is an important player in the European real estate market. As a direct result of the Foundation's actions, Fenton's business relationship with MeAg has been destroyed.

<u>**COUNT I**</u>

**Breach of Contract – Obligation to Negotiate in Good Faith
(Against the Foundation, Peacock, and Laraway)**

112.    Plaintiffs incorporate by reference the preceding paragraphs as though fully set forth herein.

113.    Under Ohio law, a breach of contract requires one to show (1) the existence of a valid contract, (2) performance by the claimant, (3) breach by the defendant, and (4) damages.

114.     On March 22, 2024, Defendant Peacock and Defendant Laraway, Chief Officers of the Foundation, sent an email to Fenton that stated: "On behalf of myself [Peacock] and Dennis [Laraway] we are proposing that the [Foundation] and CCL teams re-engage with you to progress the contractual documentation for [the Property]." The email included the following statements:

a.      The Property is "the location and project pathway that best fits [Cleveland's] strategy and needs;"

b.      Cleveland would move forward "to progress the contractual documentation for [the Property];" and

c.      In response to Mr. Sharma's second email, Defendant Peacock confirmed Mr. Sharma's statement that "[Fenton] look[ed] forward to working with [Cleveland's] team to finalise the deal and deliver the facility."

115.     These statements were consistent with Mr. Herb's statement on March 18, 2024, where he indicated that Cleveland had decided to move forward with the Transaction. It is also consistent with his statement that Cleveland was no longer considering other properties for its cancer center, as well as Cleveland's and the individual defendants' conduct in negotiations.

116.     Furthermore, for more than a month following Defendant Peacock and Laraway's email, Fenton and Cleveland worked intensively to complete the Transaction by May 15, 2024. Between March 22 and April 24, 2024, Fenton and Cleveland, including Defendant Rios, had many legal and accounting calls with outside advisors, had agreed on all material terms, and had nearly finalized the Transaction documents. The parties also re-started the formal weekly design team calls and conducted site visits.

117.     These statements and Defendants' conduct as described herein formed a contract between the parties, in which the Foundation agreed to negotiate in good faith to finalize the deal.

118.    Defendants violated their obligation to negotiate in good faith by summarily cutting off negotiation on the eve of the final drafting session without explanation or justification and with the knowledge that Fenton would be unable to find an alternative partner in time to close on the purchase of the Property.

119.    For instance, upon information and belief, contrary to its statements that it had ended negotiations for other properties so it could move forward with the Property, the Foundation had remained in negotiations for space in at least one property, 40 Grosvenor Place, which it subsequently leased to establish its cancer center. Upon information and belief, the Foundation informed Fenton that it had ended negotiations for alternative properties—when it had not—so that Fenton would cease its efforts to enter into a development deal with another healthcare provider, leaving the Property as a back-up option for Cleveland in case its negotiations for deals on other properties, including 40 Grosvenor Place, fell through. Upon information and belief, the Foundation and Defendants Peacock and Rios deliberately waited until the night before the transaction documents were due to be finalized to notify Fenton that the Foundation would not move forward with the Property.

120.    Moreover, by terminating the Transaction with just three weeks before it was scheduled to close, the Foundation eliminated the substantial risk that Fenton would enter into a development agreement with a competing healthcare provider, who would then move into the space next door to the Cleveland Clinic London Hospital.

121.    Defendants Peacock, Laraway, and Rios had knowledge of the parties' business relationship, were heavily involved in the negotiations throughout the life of the deal, and were, upon information and belief, aware of the status of the negotiations and contracts relating to other properties, including 21 GP and 40 Grosvenor Place. These individual defendants breached their

obligation to negotiate in good faith and aided and abetted the Foundation's breach of its obligation to negotiate in good faith.

122.    In reliance on the Foundation's promises, which were bolstered by Cleveland's conduct, Fenton stopped discussions with potential alternative partners to develop the Property in order to move forward with negotiations, finalize the deal, and deliver the cancer center for Cleveland. Had the Foundation not agreed to act in good faith to negotiate and finalize the deal, Fenton would have pursued other partners to purchase and develop the Property.

123.    As a result of Defendants' breach, 21 GP lost its deposit of approximately $7.8 million. Fenton further incurred approximately $1.8 million in out-of-pocket expenses for third party professional services, and was deprived of the opportunity to pursue other transactions at a cost of at least $25 million in reasonably certain and foreseeable lost profits. Fenton suffered other damages to be proven at trial.

## COUNT II

**Promissory Estoppel**
**(In the Alternative to Breach of Contract, Count I)**
**(Against the Foundation, Peacock, and Laraway)**

124.    Plaintiffs incorporate by reference the preceding paragraphs as though fully set forth herein.

125.    Under Ohio law, the elements of a promissory estoppel claim are: (1) there must be a clear and unambiguous promise, (2) the party to whom the promise was made must rely on it, (3) the reliance is reasonable and foreseeable, and (4) the party relying on the promise must have been injured by the reliance.

126.    On March 22, 2024, Defendant Peacock and Defendant Laraway, Chief Officers of the Foundation, sent an email to Fenton with the following statements:

a. The Property is "the location and project pathway that best fits [Cleveland's] strategy and needs;"

b. Cleveland would move forward "to progress the contractual documentation for [the Property];" and

c. In response to Mr. Sharma's second email, Defendant Peacock confirmed Mr. Sharma's statement that "[Fenton] look[ed] forward to working with [Cleveland's] team to finalise the deal and deliver the facility."

127. Peacock and Laraway made the promise personally, stating "On behalf of myself [Defendant Peacock] and [Defendant Laraway], we are proposing that the [Foundation] and CCL teams re-engage with you to progress the contractual documentation for [the Property]."

128. This was consistent with Mr. Herb's statement on March 18, 2024, where he indicated that Cleveland had decided to move forward with the Transaction. It is also consistent with his statement that Cleveland was no longer considering other properties for its cancer center.

129. As further evidence of the Foundation, Peacock, and Laraway's promise, for more than a month following Defendant Peacock's email, Fenton and Cleveland worked intensively to complete the Transaction by May 15, 2024. Between March 22 and April 24, 2024, Fenton and Cleveland, including executives of the Foundation, had many legal and accounting calls with outside advisors, had agreed on all material terms, and had nearly finalized the Transaction documents. The parties also re-started the formal weekly design team calls and conducted site visits.

130. These statements and Defendants' conduct as described herein formed a clear and unambiguous promise in which the Foundation, Peacock, and Laraway agreed to negotiate in good faith and finalize the deal.

131.    However, Defendants did not act in good faith to negotiate and finalize the deal.

a.      For instance, upon information and belief, contrary to its statements that it had ended negotiations for other properties so it could move forward with the Property, the Foundation had remained in negotiations for at least one property, 40 Grosvenor Place, which it subsequently leased to establish its cancer center. Upon information and belief, the Foundation informed Fenton that it had ended negotiations for alternative properties—when it had not—so that Fenton would cease its efforts to enter into a development deal with another healthcare provider, leaving the Property as a back-up option for Cleveland in case its negotiations for deals on other properties, including 40 Grosvenor Place, fell through. Upon information and belief, the Foundation and Defendants Peacock and Rios deliberately waited until the night before the transaction documents were due to be finalized to notify Fenton that the Foundation would not move forward with the Property

b.      Additionally, by terminating the Transaction with just three weeks before it was scheduled to close, leaving Fenton with no opportunity to find an alternative partner, the Foundation eliminated the substantial risk that Fenton would enter into a development agreement with a competing healthcare provider, who would then move into the space next door to the Cleveland Clinic London Hospital.

132.    In reliance on the Defendants' promises, Fenton stopped discussions with potential alternative partners to develop the Property in order to move forward with negotiations, finalize the deal, and deliver the cancer center for Cleveland. Had the Foundation not agreed to act in good faith to negotiate and finalize the deal, Fenton would have pursued other partners to purchase and develop the Property.

133.     This reliance was foreseeable because Fenton informed the Foundation, including Defendants Peacock, Laraway, and Rios personally, that it would end its negotiations with Cleveland and pursue the project with other partners if the Foundation did not agree to complete the Transaction in writing by March 22, 2024. It was also foreseeable that Fenton relied on Defendants' statements that the Foundation would act ethically and transparently during negotiations.

134.     Defendants Peacock, Laraway, and Rios had knowledge of the parties' business relationship, were heavily involved in the negotiations throughout the life of the deal, and were, upon information and belief, aware of the status of the negotiations and contracts relating to other properties, including 40 Grosvenor Place.

135.     As a result of Fenton's reliance on Defendants' promises, 21 GP lost its deposit of approximately $7.8 million. Fenton further incurred approximately $1.8 million in out-of-pocket expenses for third party professional services, and was deprived of the opportunity to pursue other transactions at a cost of nearly $25 million in reasonably certain and foreseeable lost profits. Fenton suffered other damages to be proven at trial.

## **COUNT III**

**Tortious Interference with Business Relationship with CCL**
**(Against the Foundation, Peacock, and Rios)**

136.     Plaintiffs incorporate by reference the preceding paragraphs as though fully set forth herein.

137.     Under Ohio law, to recover for a claim of tortious interference with a business relationship, one must prove (1) the existence of a business relationship, (2) the wrongdoer's knowledge thereof, (3) an intentional interference causing a break or termination of the relationship, and (4) damages resulting therefrom.

138.    A business relationship existed between 21 GP and CCL as they negotiated a deal to develop the Property and agreed on material terms. CCL confirmed the existence of this relationship by email and conduct on a near-daily basis between March 22 – April 24, 2024.

139.    The Foundation and its executives, including Defendants Peacock, Laraway, and Rios, had extensive knowledge of the business relationship between 21 GP and CCL.

140.    Defendants the Foundation, Peacock, and Rios intentionally interfered with, and caused the termination of, the business relationship between 21 GP and CCL through the following conduct:

   a.    Defendants the Foundation, Peacock, and Rios knew that, in reliance upon the Foundation's representations and conduct, Fenton stopped discussions with other potential development partners after March 22, 2024, and refrained from re-engaging in those discussions between March 22 – April 2024.

   b.    Defendants the Foundation, Peacock, and Rios also knew that three weeks was not sufficient time for Fenton to structure another transaction and fund the purchase of the Property with a different partner.

   c.    Despite this knowledge, on April 25, 2024, Defendants the Foundation, Peacock, and Rios knowingly and intentionally acted to prevent contract formation between 21 GP and CCL when they blocked the completion of the Transaction.

141.    Upon information and belief, Defendant Peacock is or was a member of the CCL Board. However, at all relevant times, Defendant Peacock simultaneously represented the Foundation as its Chief Operating Officer, committed himself to the Foundation as its corporate executive, and interfered with relationships on behalf of the Foundation as its corporate executive.

142.    Defendants the Foundation, Peacock, and Rios' actions as described above were taken in bad faith, for nefarious reasons, and are without privilege or justification.

143.    As a direct and proximate result of the Defendants the Foundation, Peacock, and Rios' tortious interference with 21 GP's business relationship with CCL, 21 GP lost its deposit of approximately $7.8 million. Fenton further incurred approximately $1.8 million in out-of-pocket expenses for third party professional services, and was deprived of the opportunity to pursue other transactions at a cost of at least $25 million in lost profits. Fenton suffered other damages to be proven at trial.

## COUNT IV

### Intentional Interference with Contract
### (Against the Foundation, Peacock, and Rios)

144.    Plaintiffs incorporate by reference the preceding paragraphs as though fully set forth herein.

145.    Under Ohio law, to recover for a claim of intentional interference with a contract, one must prove (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages.

146.    Fenton was a party to the MeAg Agreement, which required Fenton to purchase the Property by May 15, 2024. All Defendants knew of the MeAg Agreement and its terms.

147.    Defendants the Foundation, Peacock, and Rios intentionally procured 21 GP's breach of the MeAg Agreement through the following conduct:

        a.      At all relevant times, the Foundation, Peacock, and Rios knew that Fenton was actively engaged in discussions with multiple parties who were interested in developing or investing in the Property.

b.      At all relevant times, the Foundation, Peacock, and Rios knew that, under the MeAg Agreement, if 21 GP did not finalize a development deal and fund the purchase of the Property by May 15, 2024, 21 GP would be in breach of the Agreement.

c.      The Foundation, Peacock, and Rios also knew that Fenton would end its negotiations with Cleveland and pursue the project with other partners if the Foundation did not commit to completing the Transaction in writing by March 22, 2024. If Fenton ended its negotiations, Cleveland would not only lose the opportunity to use the Property for itself but also faced a substantial risk that a competing healthcare provider could move into the space next door.

d.      With this knowledge, on March 22, 2024, Defendant Peacock and Defendant Laraway sent an email to Mr. Sharma stating that Cleveland intended to move forward with the Transaction. This was consistent with Mr. Herb's statement on March 18, 2024, where he indicated that Cleveland had decided to move forward with the Transaction. In reliance on Cleveland's representations, Fenton terminated discussions with potential alternative partners in order to move forward and complete the Transaction with CCL.

e.      From March 22 through April 24, 2024, Cleveland represented on several occasions that it was planning to move forward with the Transaction. In reliance on Cleveland's ongoing representations, Fenton refrained from re-engaging in discussions with potential alternative partners.

f.      Defendants the Foundation, Peacock, and Rios knew that Fenton disengaged from discussions with other interested parties in reliance on the Foundation's representations and conduct. Defendants the Foundation, Peacock, and Rios also knew that, by the time Fenton was notified on April 25, 2024, that the Foundation had withdrawn from the

Transaction, less than three weeks before the MeAg Agreement's May 15 deadline, Fenton would not have enough time to structure another transaction and fund the purchase of the Property.

g.      As a direct and proximate result of these actions by Defendants, Fenton was unable to fund the purchase of the Property and breached the MeAg Agreement.

h.      Had the Foundation not committed to the Transaction and induced Fenton to cease discussions with all other interested parties, 21 GP would not have breached the MeAg Agreement.

148.    Upon information and belief, Defendant Peacock is or was a member of the CCL Board. However, at all relevant times, Defendant Peacock simultaneously represented the Foundation as its Chief Operating Officer, committed himself to the Foundation as its corporate executive, and interfered with MeAg Agreement on behalf of the Foundation as its corporate executive.

149.    The actions of Defendants the Foundation, Peacock, and Rios as described above were taken in bad faith, for nefarious reasons.

150.    The Defendants had no business justification for improperly interfering with the MeAg Agreement. Defendants have had many opportunities to explain their business reasons for taking these actions, but have not done so.

151.    As a direct and proximate result of the Foundation's tortious conduct, 21 GP lost its deposit of approximately $7.8 million. Fenton further incurred approximately $1.8 million in out-of-pocket expenses for third party professional services, and was deprived of the opportunity to pursue other transactions at a cost of nearly $25 million in reasonably certain and foreseeable lost profits. Fenton suffered other damages to be proven at trial.

## COUNT V

**Tortious Interference with Other Business Relationships**
**(Against the Foundation)**

152.    Plaintiffs incorporate by reference the preceding paragraphs as though fully set forth herein.

153.    Under Ohio law, to recover for a claim of tortious interference with a business relationship, one must prove (1) the existence of a business relationship, (2) the wrongdoer's knowledge thereof, (3) an intentional interference causing a break or termination of the relationship, and (4) damages resulting therefrom.

154.    A business relationship existed between Fenton and CBRE.

155.    The Foundation had knowledge of the business relationship between Fenton and CBRE.

156.    On information and belief, the Foundation intentionally interfered with, and caused a termination of, the business relationship between Fenton and CBRE by instructing and pressuring CBRE not to work with Fenton following Cleveland's withdrawal from the Project at 21 Grosvenor Place.

157.    A business relationship existed between Fenton and MeAg.

158.    The Foundation had knowledge of the business relationship between Fenton and MeAg.

159.    On information and belief, the Foundation intentionally interfered with, and caused a termination of, the business relationship between Fenton and MeAg by instructing and pressuring MeAg not to work with Fenton following Cleveland's withdrawal from the Project at 21 Grosvenor Place.

160.     The Foundation's actions as described above were intentional, taken in bad faith, for nefarious reasons, and are without privilege or justification.

161.     As a direct and proximate result of the Foundation's tortious interference with Fenton's business relationships with CBRE and with MeAg, Fenton has been deprived of significant business opportunities and has suffered reputational harm. Fenton has incurred damages in an amount to be determined at trial.

## COUNT VI

### Unjust Enrichment
### (In the Alternative to Breach of Contract, Count I)
### (Against the Foundation)

162.     Plaintiffs incorporate by reference the preceding paragraphs as though fully set forth herein.

163.     The Foundation was unjustly enriched by (1) the value of the money and time spent designing a medical center to fit the Foundation's specifications and (2) the value of having the Property as a backup option that the Foundation used as leverage in negotiations for alternative development sites.

164.     Under Ohio law, to recover for a claim of unjust enrichment, one must show: (1) the plaintiff conferred a benefit on the defendant, (2) the defendant knew of the benefit, and (3) it would be unjust to permit the defendant to retain the benefit without payment.

165.     Fenton conferred benefits on the Foundation in preparing for the Transaction, including money and time spent on development designs for the Property. Fenton did so through the following actions:

        a.     Fenton incurred over $1.8 million in out-of-pocket expenses in support of the Transaction in third-party design, architectural, and professional service fees in planning to fit the Property to the Foundation's specifications.

        b.     Fenton retained the services of mechanical and electrical engineers Hoare Lea LLP, architects Fred Pilbrow & Partners Ltd., specialist healthcare practice CSM Architects, and structural engineers AKT II.

        c.     Fenton spent hundreds of hours planning to develop the Property in accordance with the Foundation's specifications.

        d.     Representatives from Fenton and the above-listed entities participated in weekly design meetings in addition to multiple smaller meetings at various times.

        e.     Representatives of Fenton, the Foundation, CCL, and others participated in design-related meetings on at least the following dates: March 21, March 27, March 30, April 3, April 10, April 17, April 23, and April 24.

        f.     The Foundation benefitted from having architectural and design plans it could use for the development of a medical center that requires unique specifications.

        g.     On information and belief, Cleveland has converted intellectual property and work product funded and delivered by Fenton for its own purposes in connection with the design and anticipated development of a cancer center at 40 Grosvenor Place, without compensation to Fenton.

166.    At all relevant times, the Foundation had knowledge of the benefits of the services Fenton provided. Representatives of the Foundation participated in design-related meetings. On March 11, 2024, Mr. Sharma wrote to Mr. Herb, "[w]e have now spent in excess of £1m and

thousands of hours on legal and design for CCL to demonstrate the centre can be delivered to your requirements."

167.    Permitting the Foundation to retain the benefit of these services without paying Fenton would be unjust, because the Foundation induced Fenton to work on designing a medical center for the Foundation in bad faith.

168.    The Foundation also benefitted from Fenton's commitment to developing the Property.

        a.    On information and belief, the Foundation used the Transaction as leverage in negotiating with other potential partners.

        b.    On information and belief, the Foundation wanted to keep the Property as a backup option in the event other deals did not work out.

        c.    On information and belief, while Fenton was working to complete the Transaction, the Foundation was negotiating a deal to develop 40 Grosvenor Place. The Foundation ultimately selected 40 Grosvenor Place instead of the Property as the site to develop its medical center.

        d.    The Foundation benefited from the work that Fenton performed during the course of negotiations, including approximately $1.8 million in third party professional fees, which were borne entirely by Fenton.

169.    At all relevant times, the Foundation had knowledge of the benefit conferred by Fenton, because the Foundation was the party engaged in negotiations.

170.    Permitting the Foundation to retain the benefit of Fenton's commitment would be unjust, because the Foundation induced Fenton to work on completing the Transaction through fraud.

171. As a direct and proximate result of the Foundation's actions, it has been unjustly enriched in an amount in excess of $75,000, in an amount to be proven at trial.

## Prayer for Relief

**WHEREFORE**, Plaintiffs pray that the Court enter judgment in their favor and against the Foundation, awarding Plaintiffs the following:

A. Damages, in an amount to be determined at trial;

B. Interest, attorneys' fees and costs, where available; and

C. Such other relief as the Court may deem appropriate.

Dated:  February 12, 2025                    Respectfully submitted,

**FLANNERY | GEORGALIS, LLC**

By:  */s/ Christos N. Georgalis*
Christos N. Georgalis (OH: 0079433)
Patrick M. Rahill (OH: 0093556)
1375 E. Ninth Street, 30th Floor
Cleveland, OH 44114
Tel: (216) 466-0169 (Chris)
Tel: (216) 466-0635 (Patrick)
Fax: (614) 526-0601
chris@flannerygeorgalis.com
prahill@flannerygeorgalis.com

**DORSEY & WHITNEY LLP**

By:  */s/ Kirsten Schubert*
Kirsten Schubert (MN: 0388396)
Anna Boyle (MN: 0397323)
*Pro hac vice applications to be filed*
50 S. Sixth Street, Suite 1500
Minneapolis, MN 55402
Tele: (612) 340-2600
Fax: (612) 340-2868
schubert.kirsten@dorsey.com
boyle.anna@dorsey.com

*Attorneys for Plaintiffs*

## **JURY DEMAND**

Plaintiffs demand that all triable claims and issues be tried to a jury as provided in Rule 38 of the Federal Rules of Civil Procedure.

*/s/ Christos N. Georgalis*
Christos N. Georgalis (OH: 0079433)