# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **Fenton Whelan Limited, et al.,** | **Case No. 1:25-cv-00275-PAB** |
| **Plaintiffs,** | |
| **-vs-** | |
| | **JUDGE PAMELA A. BARKER** |
| **Cleveland Clinic Foundation, et al.** | |
| **Defendants.** | **MEMORANDUM OPINION & ORDER** |

Currently pending before the Court is Defendants The Cleveland Clinic Foundation ("CCF"), William Peacock, Dennis Laraway, and Jorge "Pat" Rios' (collectively, "Defendants") Motion to Dismiss Plaintiff's Amended Complaint on *Forum Non Conveniens* Grounds (the "Motion to Dismiss"). (Doc. No. 19.)  Plaintiffs Fenton Whelan Limited ("Fenton") and 21 GP Limited ("21 GP") filed a Brief in Opposition to Defendants' Motion to Dismiss on May 7, 2025, to which Defendants replied on May 21, 2025.  (Doc. Nos. 19, 25.)  Also pending is Plaintiffs' Motion for Leave to File a Sur-Reply (the "Motion for Leave").  (Doc. No. 26.)  Defendants filed a Response to the Motion for Leave on May 30, 2025.  (Doc. No. 28.)

For the reasons set forth herein, Plaintiffs' Motion for Leave (Doc. No. 26) and Defendants' Motion to Dismiss (Doc. No. 19) are GRANTED as set forth herein.  The proposed Sur-Reply attached to the Motion for Leave is deemed filed as of May 29, 2025.  Plaintiffs' Amended Complaint is dismissed without prejudice.  Dismissal is conditioned upon the following terms: (1) Defendants shall consent to, and shall not challenge, service and jurisdiction in England; (2) in the English proceeding, Defendants shall produce to Plaintiffs any evidence in their possession, custody, or control that is located in the United States and is discoverable under English law; and (3) in the

English proceeding, Defendants shall, at their cost, make their employees that are relevant to this dispute, as determined by English law, available to testify at trial or at any other applicable proceeding.  Plaintiffs shall have the right to refile this action if Defendants fail to abide by the preceding conditions or if the English court determines that it lacks jurisdiction over Defendants regarding this dispute.

## I.    Relevant Factual Allegations in the Amended Complaint

### A.    The parties enter into negotiations for the acquisition of certain property in London, England

Plaintiffs are English entities.  (Doc. No. 11 at ¶ 14–15.)  Fenton is a "property development and design business" based in London.  (*Id.* at ¶¶ 14, 28.)  21 GP is Fenton's subsidiary and was formed to develop the property at issue in this lawsuit (the "Property").  (*Id.* at ¶ 15.)  Defendant CCF is based in Cleveland, and Defendants Laraway (CCF's CFO), Peacock (CCF's CEO), and Rios (CCF's Global Head of Real Estate and Construction) reside in Cleveland.  (*Id.*at ¶¶ 17–20.)  The Property is located at 21-24 Grosvenor Place in London, England and "is next door to the Cleveland Clinic London Hospital."  (*Id.* at ¶ 2.)  The Property was initially owned by non-party MeAg Munich ERGO ("MeAg").  (*Id.* at ¶ 3.)

In the spring of 2023, Fenton entered into negotiations with Defendant CCF and non-party Cleveland Clinic London Ltd. ("CCL") for Fenton to jointly develop a cancer center at the Property (hereinafter "the Project").  (*Id*. at ¶¶ 2, 32.)  "The general framework of the transaction was for Fenton to purchase and develop the Property, which CCL would lease and occupy." (*Id.* at ¶ 2.)  CCL is a subsidiary of CCF.  (*Id.* at ¶ 2.)  On September 15, 2023, 21 GP and CCL "signed Heads of Terms, which contained detailed terms relating to the purchase and development of the Property." (*Id.* at ¶ 40.)  During the negotiations, Defendant Laraway, Chief Financial Officer of CCF, and non-

party Dr. Tomislav Mihaljevic, CCF's global CEO, visited London and toured the Property. (*Id.* at ¶¶ 19, 38, 41.)

In December 2023, "despite months of negotiations, CCL and CCF unexpectedly withdrew from discussions regarding the purchase and development of the Property." (*Id.* at ¶ 44.) Plaintiffs allege that CCF and CCL "approached MeAg directly about buying and developing the Property without Fenton." (*Id.* at ¶ 45.) Plaintiffs further allege that "[b]y cutting Fenton out of the project, and working with MeAg directly, [CCF and CCL] attempted to leverage and reap the benefits of the substantial investment and contributions that Fenton had already made to the Project, leaving Fenton with nothing." (*Id.* at ¶ 46) CCF and CCL, however, were "unable to complete a deal for the purchase of the Property with MeAg." (*Id.*)

### B. 21 GP enters into an agreement to purchase the Property

"[R]ecognizing the Property's extraordinary value proposition," Fenton entered into discussions with MeAg regarding the purchase of the Property. (*Id.* at ¶¶ 30, 47.) 21 GP entered into a purchase agreement with MeAg (the "MeAg Agreement") in December 2023. (*Id.* at ¶ 48.) Under the MeAg Agreement, 21 GP agreed to purchase the Property for the price of £61,610,600 (approximately $78 million) by May 15, 2024 and paid a non-refundable deposit of £6,161,060 (approximately $7.8 million) to secure the Property. (*Id.*) Under the terms of the MeAg Agreement, if 21 GP failed to fund the Property purchase by May 15, 2024, 21 GP would be in breach of the Agreement and lose its $7.8 million deposit "and all other money and resources expended on the Project, as well as its anticipated profits." (*Id.* at ¶ 49.)

### C. The parties' negotiations resume

"After learning that 21 GP had entered into the MeAg Agreement," CCF and CCL "asked to re-start discussions with Fenton regarding the purchase and development of the Property." (*Id.* at ¶

3

51.)  An in-person meeting was held on around January 19, 2024 in CCL's London offices, during which CCF and CCL representatives "informed Fenton of [CCF's] extraordinary ethical standards" and expressed that "frank and honest communication between Fenton and [CCF and CCL] with respect to the Project was essential."  (*Id.* at ¶ 52.)  In attendance were representatives of CCF and CCL.  (*Id.*)  At the meeting "representatives from [CCF] insisted that representatives from Fenton travel to Ohio to meet with [CCF's] U.S. executive leadership team."  (*Id.* at ¶ 53.)  CCF and CCL "made it clear that it would engage in discussions if Fenton agreed to meet with [CCF's] executive leadership in Cleveland, Ohio."  (*Id.*)

On February 21, 2024, Fenton representatives Sanjay Sharma and James Van Den Heule met with Defendants Laraway, Peacock, and Rios at CCF's home offices in Cleveland.  (*Id.* at ¶ 55.)  After this visit, the parties participated in numerous calls and design team meetings, conducted site visits, and continued to negotiate terms prior to the May 15, 2024 deadline in the MeAg Agreement.  (*Id.* at ¶¶ 56–86.)  During this time period, Plaintiffs repeatedly and explicitly stated to Defendants that Plaintiffs needed CCF to commit to the Project by mid-March 2024, in light of the May 15, 2024 funding deadline.  (*Id.* at ¶¶ 56, 57, 60, 64.)  As of March 11, 2024, CCF and CCL "had not fully committed to the Project."  (*Id.* at ¶ 60.)  On March 18, 2024, CCL's CFO (Michael Herb) met with Fenton at Fenton's offices.  (*Id.* at ¶ 62.)  At that meeting, Mr. Herb indicated that CCL and CCF were "looking at other properties in London," but "that he considered the other properties to be backup only" and "was committed to move forward with developing [the] cancer center at the Property."  (*Id.* at ¶ 63.)

4

### D.      The parties' negotiations cease

On April 25, 2024 (the day after an extensive design team call and the day before a scheduled final drafting session), "Defendants Peacock and Rios scheduled a video conference with Mr. Sharma, on just a few hours' notice." (*Id.* at ¶ 87.)  "During that call, which lasted approximately five minutes, Defendants Peacock and Rios informed Mr. Sharma that CCF's executive leadership had decided to not proceed with the transaction." (*Id.* at ¶ 88.)   "Defendants Peacock and Rios did not provide any reason for the Foundation's sudden decision to terminate the project, and refused to discuss alternative plans." (*Id.* at ¶ 90.)  Plaintiffs allege that CCF and CCL had given no prior warning of the decision to terminate the Project and, to the contrary, "until that moment . . . had demonstrated unequivocally that [they] would be ready to close the Transaction by the May 15 deadline." (*Id*. at ¶ 89.)

"In the weeks and months after CCF blocked the transaction, Fenton learned that CCL had instead decided to lease new space in a different property, located at 40 Grosvenor Place, to develop the cancer center." (*Id.* at ¶ 98.)  Plaintiffs allege that CCF and CCL were "tying up the Property as a 'spare,' in case another property, such as 40 Grosvenor Place, did not work out." (*Id.* at ¶ 101.)

"Ultimately, 21 GP was unable to fund the purchase of the Property by May 15, 2024," and it lost its £6,161,060 (approximately $7.8 million) deposit under the MeAg Agreement.  (*Id.* at ¶ 97.) Plaintiffs further allege that "Fenton also suffered over £1,400,000 (about $1.8 million) in losses from third-party expenses for professional services which were incurred to develop the Property to CCL's specifications." (*Id*.)  Plaintiffs also allege that "Fenton has suffered at least £20,000,000 (over $25 million) in reasonably certain and foreseeable lost profits." (*Id*.)  Lastly, Plaintiffs allege that CCF and CCL have instructed and pressured CBRE, a company with which Fenton has "a long-term

business relationship," not to do business with Fenton. (*Id.* at ¶ 107–109.) Plaintiffs further allege that MeAg will no longer do business with Fenton. (*Id.* at ¶ 111.)

## II.    Procedural History

In October 2024, Plaintiffs threatened to sue Defendants in Ohio. (Doc. No. 19-2 at ¶ 14.) In response, on January 24, 2025, Defendants filed an anti-suit injunction action in the High Court of England. (*Id.*; Doc. No. 19-3.) In this action, Defendants sought an injunction, among other things, (1) that would enjoin Plaintiffs from filing any lawsuit regarding the transaction at issue in a Court outside of England and Wales, and (2) that would require Plaintiffs to dismiss this action. (Doc. No. 19-3 at ¶ 21.) On February 21, 2025, Plaintiffs filed their "Defence" (e.g. their answer) and did not assert any counterclaims against Defendants. (Doc. No. 23, Ex. 1 at ¶ 38.8.)[1]

On February 12, 2025, prior to filing their Defence in the anti-suit injunction action, Plaintiffs initiated this action against CCF, Peacock, Laraway, and Rios. (Doc. No. 1.) On February 20, 2025, Plaintiffs filed their Amended Complaint naming the same Defendants. (Doc. No. 11.) Therein, Plaintiffs bring the following six claims for relief: (1) Breach of Contract – Obligation to Negotiate in Good Faith; (2) Promissory Estoppel; (3) Tortious Interference with Business Relationship with CCL; (4) Intentional Interference with Contract; (5) Tortious Interference with Other Business Relationships; and (6) Unjust Enrichment. (*Id.*)

On April 7, 2025, Defendants filed their Motion to Dismiss Plaintiffs' Amended Complaint on *Forum Non Conveniens* Grounds. (Doc. No. 19.) Plaintiffs filed their Brief in Opposition to Defendants' Motion to Dismiss on May 7, 2025, to which Defendants replied on May 21, 2025. (Doc. Nos. 21, 26.) On May 29, 2025, Plaintiffs filed their Motion for Leave to File a Sur-Reply. (Doc.

---

[1] From the record before it, the Court cannot discern the current status of the anti-suit injunction case. Also, the parties have not advised the Court whether the English court issued the requested injunction.

No. 26.) On May 30, 2025, Defendants filed their Response to Plaintiff's Motion for Leave to File a Sur-Reply.  (Doc. No. 28.)  Plaintiffs did not file a Reply.

Accordingly, Defendants' Motion to Dismiss and Plaintiff's Motion for Leave are ripe for review.

## III.    Standard of Review

"*Forum non conveniens* is a common law doctrine that allows a district court not to exercise its jurisdiction."  *Jones v. IPX Int'l Equatorial Guinea, S.A.*, 920 F.3d 1085, 1090 (6th Cir. 2019) (citing *Hefferan v. Ethicon Endo-Surgery Inc.*, 828 F.3d 488, 492 (6th Cir. 2016)).  The doctrine "generally applies when the alternative forum is in the foreign country, rather than in a different district within the federal system."  *Id.* (citing *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007)).

When assessing whether to dismiss a case under this doctrine, "'the central focus' is 'convenience.'"  *Prevent USA Corp. v. Volkswagen AG*, 17 F.4th 653, 658 (6th Cir. 2021) (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 237 (1981)).  With this guidepost in mind, a district court must evaluate three considerations: "(1) whether an adequate alternative forum is available; (2) whether a balance of private and public interests suggests that trial in the chosen forum would be unnecessarily burdensome for the defendant or the court; and (3) the amount of deference to give the plaintiff's choice of forum."  *Jones*, 920 F.3d at 1090.

"*Forum non conveniens* decisions are 'committed to the sound discretion of the trial court.'"  *Id.* (quoting *Piper*, 454 U.S. at 237).

7

## IV.     Analysis

### A.     Plaintiffs' Motion for Leave to File a Sur-Reply

Before turning to Defendants' Motion to Dismiss, the Court first addresses Plaintiff's Motion for Leave to File a Sur-Reply.

"Although the Federal Rules of Civil Procedure do not expressly permit the filing of sur-replies, such filings may be allowed in the appropriate circumstances, especially '[w]hen new submissions and/or arguments are included in a reply brief, and a nonmovant's ability to respond to the new evidence has been vitiated.'" *Key v. Shelby Cty.*, 551 F. App'x 262, 265 (6th Cir. 2014) (quoting *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 481 (6th Cir. 2003)); *accord Eldridge v. Cardif Life Ins. Co.*, 266 F.R.D. 173, 175 (N.D. Ohio 2010) ("This Court grants leave to file a sur-reply to afford a party an opportunity to address new issues raised for the first time in the reply").  When a reply, however, does not include new arguments or evidence, a sur-reply is "an impermissible attempt to have the last word." *Attractive Surgical, LLC v. Cleveland Clinic Found.*, 2019 WL 11075734 at *4 (N.D. Ohio Oct. 31, 2019). The decision of whether to allow a sur-reply is "left to the broad discretion of the trial court." *Carter v. Paschall Truck Lines, Inc.*, 364 F.Supp.3d 732, 748 (W.D. Ky. 2019).

In their Motion for Leave, Plaintiffs argue that their "[p]roposed Sur-Reply, addresses new evidence and arguments raised by Defendants for the first time in their Reply in Support of Defendants' Motion to Dismiss."  (Doc. No. 26, PageID #702.)  In their Response, Defendants assert that they will "rest on their previously filed papers" and "in the interest of efficiency, Defendants do not object to Plaintiffs' motion for leave to file a sur-reply."  (Doc. No. 28, PageID #725.)  In the interest of efficiency, and given Defendants' non-objection, the Court grants Plaintiffs' Motion for

8

Leave to File a Sur-Reply.  The proposed Sur-Reply (Doc. No. 26-1) attached to the Motion for Leave is deemed filed as of May 29, 2025.

### B.      Defendants' Motion to Dismiss

The Court will next turn to Defendants' Motion to Dismiss.  Pursuant to Sixth Circuit law, the Court will assess "(1) whether an adequate alternative forum is available; (2) whether a balance of private and public interests suggests that trial in the chosen forum would be unnecessarily burdensome for the defendant or the court; and (3) the amount of deference to give the plaintiff's choice of forum."  *Jones*, 920 F.3d at 1090.

### 1.      Whether an adequate alternative forum is available

"When a court declines to exercise jurisdiction under *forum non conveniens*, it is saying that the case should be tried elsewhere."  *Jones*, 920 F.3d at 1090.  Such a finding "presupposes that an alternative forum exists, which requires another forum to be both available and adequate."  *Id.* (citing *Piper Aircraft*, 454 U.S. at 254, n.22).  "Countries that have jurisdiction over the defendant typically qualify."  *Prevent USA*, 17 F.4th at 659 (citing *Piper Aircraft*, 454 U.S. at 254, n.22).  Thus, the Court will assess whether England is an "available" forum and, if so, whether England is an "adequate" forum.

### i.      England is an available forum

In their Motion to Dismiss, Defendants argue that the United Kingdom is an available and adequate alternative forum.  (Doc. No. 19, PageID #172–73.)  They assert that "Defendants have consented to service and jurisdiction in England by virtue of their anti-suit injunction action, and will maintain their consent as a condition to dismissal."  (*Id.* at PageID #172.)  To support their argument, they attach the Declaration of Timothy Morshead, KC who opines that England "would have jurisdiction to determine the disputes intimated in Plaintiffs' Amended Complaint" (Doc. No. 19-4 at

9

¶ 27), and the Declaration of Defendant Peacock who avers that Defendants "have already consented to the jurisdiction of the High Court of England."  (Doc. No. 19-2 at ¶ 15.)

In their Opposition, Plaintiffs argue that Defendants have not consented to jurisdiction in England through the anti-suit injunction action.  Specifically, Plaintiffs assert that "[t]his is not effective consent" because "submission to jurisdiction in England cannot be prospective" and "Defendants cannot have consented to an action which has not yet been brought against them."  (Doc. No. 21, PageID #298.)  They also argue that it is unclear whether Defendant "Peacock will voluntarily consent to jurisdiction and fully participate in any suit brought against him by Plaintiffs in England." (*Id.*)  Plaintiffs also argue that "Defendants Rios and Laraway have not stated that they will consent to anything." (*Id.*)  To support their arguments, Plaintiffs rely on the Declaration of Catherine Gibaud KC who opines that it is "highly uncertain" whether the English court would have jurisdiction over Defendants.  (Doc. No. 22 at ¶ 78.)

In their Reply, Defendants argue that by filing the anti-suit injunction action "Defendants expressly and unequivocally consented to the jurisdiction of the High Court of England, just as a foreign or out-of-state plaintiff does by filing suit in Ohio."  (Doc. No. 25, PageID #647.)  They also argue that Plaintiffs could have, and still can, file counterclaims in the anti-suit injunction action. (*Id.*)  Moreover, Defendants assert that they "have expressly informed Plaintiffs that they may serve any claim related to the dispute regarding the London Property on their English counsel in London." (*Id.*)  Defendants also explain that each Defendant has "expressly consented to jurisdiction in England as a condition of dismissal."  (*Id.*)  Defendants' final argument is that the Court "can conditionally dismiss this case without prejudice, pending Defendants' eventual submission to the jurisdiction of the court of England."  (*Id.* at PageID #648.)  To support their arguments, Defendants attach three

10

new declarations to their Reply: (1) the Declaration of Zoë Maria Marsden Barton, K.C., who opines that Plaintiffs can "serve the Defendants via their solicitors (i.e. counsel) located in England," (Doc. No. 25-1); (2) the Declaration of Defendant Laraway who avers that "CCF and I continue to consent to service and jurisdiction in England," (Doc. No. 25-3 at ¶ 5), and (3) the Declaration of Defendant Rios who avers that he "maintain[s] [his] consent to service and jurisdiction in England." (Doc. No. 24 at ¶ 5.)

In their Sur-Reply, Plaintiffs argue that these three new Declarations are "a material change in Defendants' position and a concession that, prior to the filing of the Reply, Defendants had not effectively consented to service or jurisdiction in any English proceeding other than the Injunction Proceeding they initiated." (Doc. No. 26-1, PageID #708.) Plaintiffs assert that "[t]he timing of the new declarations, their substance, and the abrupt shift in legal theory confirm the point: until May 21, 2025 . . . Defendants had not consented to service and jurisdiction as they had claimed, and England was not an 'available and adequate' forum for this case." (*Id.*) They also argue that "Plaintiff simply had no reason to file their claims as counterclaims in the Injunction Proceeding" and that "Defendants have not shown that Plaintiff would be permitted to bring their claims as counterclaims in the Injunction Proceeding, or that the Injunction Proceeding is a viable vehicle for Plaintiffs' claims." (*Id.* at PageID #709–11.)

"An alternative forum is available if the defendant is amendable to process there." *Jones*, 920 F.3d at 1091 (citing *Piper Aircraft*, 454 U.S. at 254, n.22). Courts have found that a defendant is amendable to process if it consents to jurisdiction. *See Wong v. PartyGaming, Ltd.*, 589 F.3d 821, 831 (6th Cir. 2009) ("PartyGaming consented to submit itself to the jurisdiction of Gibraltar with the forum selection clause, and thus, is amendable to process there"); *Rustal Trading US, Inc. v. Makki*,

11

17 F. App'x 331, 336 (6th Cir. 2001) (finding Sierra Leone an available forum when "[a]s a condition to the district court's order of dismissal, defendants-appellees agreed to submit themselves to the jurisdiction of the courts of Sierra Leone and to appear and defend against a suit brought by Rustal in Sierra Leone"); *Stewart v. Dow Chemical Co.*, 865 F.2d 103, 107 (6th Cir. 1989) (finding Canada an available forum when the Defendant stipulated that it would accept Canadian jurisdiction and service of process).

Here, Defendants have submitted evidence establishing that they all consent to jurisdiction in England and that they are amenable to process in England.  (Doc. No. 19-2 at ¶ 15; Doc. No. 25-3 at ¶ 5; Doc. No. 24 at ¶ 5.)  Defendants also represent in their Motion that they "will maintain their consent as a condition to dismissal." (Doc. No. 19, PageID #172.)  While Defendants have consented to jurisdiction in England, Plaintiffs dispute that Defendants are amenable to process in England.  As discussed below, the parties have submitted three Declarations on this issue.  Upon careful review of those Declarations, and the Court's independent review of English law, the Court finds that Defendants are amenable to process in England.

Plaintiffs rely on the Declaration of Catherine Gibaud KC to establish that Defendants are not amenable to service of process in England.  (Doc. No. 22.)  As she points out, England's Civil Procedure Rules ("CPR") generally require a court's permission to serve a defendant residing outside of the United Kingdom, and that "[i]t is highly uncertain that the Plaintiffs would be able to identify a relevant jurisdictional gateway in order for the Court to grant permission.  (*Id.* at ¶¶ 11–22, 78; *see also* CPR 6.36.)  Defendants' proffered expert, Timothy Morshead, KC asserts that Plaintiffs can serve Defendants outside of the United Kingdom under the CPR because English law "list some 25

12

circumstances in which permission will be granted" and "[m]ultiple such circumstances would apply in the present case."  (Doc. No. 19-4 at ¶¶ 20–28.)

The Court need not resolve this issue.  Upon independently reviewing English law, and reviewing the Declaration of Zoë Maria Marsden Barton, K.C. (Doc. No. 25-1), which was submitted with Defendants' Reply Brief, the Court finds that Defendants are amenable to process within England.  CPR 6.3(1)(c) provides that "[a] claim form may be served by any of the following methods—leaving it at a place specified in rule 6.7, 6.8, 6.9 or 6.10."  CPR 6.7(1)(b), in turn, permits service upon "a solicitor acting for the defendant [who] has notified the claimant in writing that the solicitor is instructed by the defendants to accept service of the claim form on behalf of the defendant at a business address within the jurisdiction."  Here, Defendants have submitted evidence that they have agreed to accept service of process through their English solicitor pursuant to CPR 6.7(1). (Doc. No. 25-2, PageID #694.)  Accordingly, Plaintiffs can serve Defendants within England pursuant to CPR 6.3(1)(c). [2]  Thus, the Court finds that Defendants are amenable to service of process in England.[3]

---

[2] In their Sur-Reply, Plaintiffs argue that Defendants' arguments regarding their consent to jurisdiction through the May 21, 2025 letter "should be disregarded because, barring 'extraordinary circumstances' not present here, the operative support for their motion must come from their opening brief."  (Doc. No. 26-1, PageID #708–09.)  The Court disagrees. Plaintiffs rely on *International-Matex Tank Terminals-Illinois v. Chem. Bank*, No. 1:08-cv-1200, 2009 U.S. Dist. LEXIS 49225 (W.D. Mich. June 11, 2009) for the proposition that "[b]arring extraordinary circumstances, both the opposing party and the court are entitled to rely on the movant's opening brief as a conclusive statement of its position on the claims targeted by the motion."  *Id.* at *7.  What Plaintiffs omit, however, is that the *International-Matex* Court was a summary judgment case, and in any event, the court recognized that "district courts have the option of either disregarding that additional evidence or providing the non-movant with the opportunity to file a surreply."  *Id.* (citation omitted).  In the interest of judicial efficiency, the Court will consider the evidence raised for the first time in Defendants' Reply because it has given Plaintiffs the opportunity to respond through their Sur-Reply.

[3] In the alternative, the Court finds that the anti-suit injunction action makes England an available forum.  The CPR provides a mechanism similar to Fed. R. Civ. P. 15 for amending a "defence" to include a counterclaim.  *See* CPR 20.4(2) ("A defendant may make a counterclaim against a claimant—(a) without the court's permission if the defendant files the counterclaim with the defence; or (b) at any other time with the court's permission").  Under this rule, Plaintiffs could seek the English court's permission in the anti-suit injunction action to include the very claims they bring here against Defendants.  While there is no guarantee that the English court would grant the motion, there is nothing preventing

Nevertheless, Defendants argue that this Court "can conditionally dismiss this case without prejudice, pending Defendants' eventual submission to the jurisdiction of the court of England." (Doc. No. 25 at PageID #648.) The Court agrees. "[A] district court may condition dismissal on a defendant accepting service of process in another forum." *Martinez-Porte v. Multi-Color Corporation*, No. 23-3971, 2024 U.S. App. LEXIS 18258, at *6 (6th Cir. July 23, 2024) (citing *Rustal trading US, Inc. v. Makki*, 17 F. App'x 331, 336 (6th Cir. 2001); 14D Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedures* § 3828.3 (4th ed. June 2024 Update)); *accord Prevent USA*, 17 F.4th at 659; *Dowling v. Richardson-Merrell, Inc.*, 727 F.2d 608, 615 (6th Cir. 1984). Thus, Plaintiffs will have the option to refile this action should Defendants fail to submit to English jurisdiction or if the English court finds that it lacks jurisdiction.

For all these reasons, the Court finds that England is an available forum.

### ii.     England is an adequate forum

In their Motion to Dismiss, Defendants argue that "Plaintiff have various claims cognizable under English law, and an English Court can resolve the issues and claims raised by Plaintiffs." (Doc. No. 19, PageID #173.) While asserting in a different section of their brief that English law does not recognize the claims of unjust enrichment and promissory estoppel (*Id.* at PageID #177–78), Defendants assert that "the reality that the foreign venue makes it more difficult to establish the claim or that the foreign law is less generous to prevailing plaintiffs does not establish unavailability." (*Id.* at PageID #173 (citation omitted).)

---

Plaintiffs from attempting to seek permission. Thus, England is also an available forum because Plaintiffs *may* be able to amend their Defence to add their claims raised in this action against Defendants.

In their Opposition, Plaintiffs argue that "Ohio law provides remedies" for Defendants' conduct, but "there is no English claim that provides any relief to Plaintiffs." (Doc. No. 21, PageID #300.) Specifically, Plaintiffs argue that Defendants' position is "that no English cause of action provides a remedy for Defendants' wrongful conduct, and if the matter is settled under English law, Plaintiffs will have no redress." (*Id.* at PageID #299.)

In their Reply, Defendants argue that "Plaintiffs seek redress in this Court because their claims might have a greater prospect of success, not because they have no avenue for redress in England." (Doc. No. 25, PageID # 649.) Defendants contend that "Plaintiffs spin Defendants' argument that the laws of Ohio and England conflict (*i.e.*, that they would present different legal outcomes) into a concession that there is no available remedy under English law." (*Id.*)

"A forum is adequate if it can remedy the alleged harm." *Jones*, 920 F.3d at 1091 (citing *Piper Aircraft*, 454 U.S. at 254, n.22). "In the 'rare circumstances' in which 'the remedy offered by the other forum is clearly unsatisfactory,' American Courts tend to keep the case." *Prevent USA*, 17 4th at 659 (citing *Piper Aircraft*, 454 U.S. at 254, n.22). "But the reality that the foreign venue makes it more difficult to establish the claim or that the foreign law is less generous to prevailing plaintiffs does not establish unavailability." *Id.* (citing *Piper Aircraft*, 454 U.S. at 254, n.22). And as the Supreme Court recognized in *Piper Aircraft*, a forum is adequate when there is "*a* form of action available" and it is "not necessary that *the* same cause of action, or even an analogous cause of action, be identified." *Solari v. Goodyear Tire and Rubber Co.*, No. 5:14CV1000, 2015 U.S. Dist. LEXIS 140400, at *11–12 (N.D. Ohio Oct. 15, 2015) (citing *Piper Aircraft*, 454 U.S. at 240–42) (emphasis in original); *see also Capital Currency Exchange, N.V. v. National Westminster Bank PLC*, 155 F.3d 603, 611 (2d Cir. 1998) ("a forum may be adequate even if it does not provide a plaintiff with causes

15

of action that are identical to those plaintiff alleged in an American court"); *National Dowling v. Richardson-Merrell, Inc.*, 727 F.2d 608, 615 (6th Cir. 1984) (finding England an adequate forum despite affidavits showing "that certain theories of tort recovery are not recognized in the United Kingdom").

Under this standard, the Court finds that English law provides an adequate remedy for Defendants' alleged conduct.  English law provides a remedy for breach of contract.  *See Eventbrite, Inc. v. Stadium Salford Grp. Ltd.*, No. 24-cv-02979-RFL, 2025 U.S. Dist. LEXIS 195442, at *7 (N.D. Cal. May 28, 2025) ("the analysis of the breach of contract claim would not differ if considered under English law").

English law also provides a remedy similar to Ohio's tortious interference with contract/business relations claims.   Specifically, English law recognizes the tort of "causing loss by unlawful means."  *Terra Firm Invs. (GP) 2 Ltd. v. Citigroup Inc.*, No. 09 Civ. 10459 (JSR), 2010 U.S. Dist. LEXIS 118168, at *19, n.5 (S.D.N.Y. Nov. 2, 2010); *Maljack Prods. v. British Pathe News*, No. 93 C 7767, 1994 U.S. Dist. LEXIS 8013, at *10 (N.D. Ill. June 14, 1994) ("Though there is some dispute between the experts on whether the tort is recognized in England, our review of the materials already submitted indicates that substantially similar theories of recovery are available under English law"); *see also* Bullen & Leake & Jacob's Precedents of Pleadings, § 60-08 (19th Ed.) (identifying the elements of the tort as (1) "use by the defendant of unlawful means, thereby," (2) "interfering with the actions of a third party in relation to the claimant," (3) "intention to cause loss to the claimant," and (4) "damage").

And with respect to Plaintiff's unjust enrichment claim, while Defendants assert that "English law does not yet recognize a freestanding claim of unjust enrichment" (Doc. No. 19, PageID #178),

16

there are English authorities recognizing this claim. *Dargamo Holdings Ltd v. Avonwick Holdings Ltd*, [2021] EWCA Civ 1149, 2021 WL 03172345 ("Despite its evolutionary nature, the common law claim in unjust enrichment can, for present purposes, be summarised (sic) as follows: a claimant has a right to restitution against a defendant who is unjustly enriched at the claimant's expense"); *Marino v. FM Capital Partners*, [2020] EWCA Civ 245, 2020 WL 00907061 ("The concern of the law in such a case is with the reversal of transfers of value between claimants and defendants, and the cause of action is unjust enrichment"); BULLEN & LEAKE & JACOB'S PRECEDENTS OF PLEADINGS, § 108-02 (19th Ed.) ("A claim in unjust enrichment can be usefully analysed (sic) by reference to four sequential questions: (i) Has the defendant benefited in the sense of being enriched? (ii) Was the enrichment at the claimant's expense? (iii) Was the enrichment unjust? (iv) Are there any defences (sic)?").  Plaintiffs have not pointed the Court to any contrary authority.

The Court notes that Plaintiff's promissory estoppel (Count II) claim, which is pled as an alternative to its breach of contract claim, would fail under English law.  *See Nat'l Oil Well Maint. Co. v. Fortune Oil & Gas, Inc.*, No. 02 CV 7666(LBS), 2005 U.S. Dist. LEXIS 8896, at *11 (S.D.N.Y. May 11, 2005) ("Under English law, the theory of promissory estoppel is recognized only as a 'shield' to defend against a claim and not as a 'sword' to form the basis of a cause of action.").  The Court nonetheless finds that England is still an adequate forum because Plaintiffs can bring *some* claim for relief against Defendants in England regarding the conduct alleged in the Amended Complaint.  *Piper Aircraft*, 454 U.S. at 240–42; *Dowling v. Richardson-Merrell, Inc.*, 727 F.2d 608, 615 (6th Cir. 1984); *Solari*, 2015 U.S. Dist. LEXIS 140400 at *11–12.

The cases cited by Plaintiffs in their Opposition do not alter the Court's conclusion.  Each case involved a forum where the plaintiff would have been afforded absolutely *no* remedy in a foreign

17

jurisdiction. In *NHL Players' Ass'n v. Plymouth Whalers Hockey* Club, 166 F. Supp. 2d 1155 (E.D. Mich. 2001), an antitrust case, the court held that Canada was not an adequate forum, because Canadian law did not provide for injunctive relief under its antitrust laws, it was unclear whether the plaintiff could seek damages under Canada's antitrust laws, and it was unlikely that the Canadian Attorney General would prosecute the alleged antitrust violation against the defendant. *Id.* at 1164. The court in *Dean-Hines v. Ross Univ. Sch. of Veterinary Med.*, No. 05-3486, 2006 U.S. Dist. LEXIS 101375 (D.N.J. Aug. 9, 2006) determined that St. Kitts was an inadequate forum because the defendants had "not shown that the St. Kitts Constitution applies to private entities like Defendants, affords litigants rights equivalent to those Plaintiff seeks to vindicate, or authorizes private rights of action." *Id.* at *13. And in *Mecum v. Host Marriott Corp.*, No. 4:04CV260, 2005 U.S. Dist. LEXIS 37409 (E.D. Tex. April 25, 2005) the court found that Alberta was not an available forum when the plaintiffs brought claims for loss of consortium and Alberta law did not recognize that claim. *Id.* at *8.

In contrast to these cases, as explained above, English law "can remedy the alleged harm" because all but one of Plaintiff's claims can be brought under English law. *Jones*, 920 F.3d at 1091; *see also Capital Currency Exchange, N.V.*, 155 F.3d at 611 ("Although it appears that plaintiffs might not be able to recover in England on some of their common law claims, the essential subject matter of the dispute can be adequately addressed by an English court"). Accordingly, the Court finds that England is an adequate forum.

### 2. Whether a balance of private and public interests that trial in the chosen forum would be unnecessarily burdensome for the defendant or the court

Having found that England is an adequate alternative forum, the Court next "examine[s] whether the plaintiff's choice of forum is unnecessarily burdensome." *Jones*, 920 F.3d at 1092 (citing

18

*Zions First Nat'l Bank v. Moto Diesel Mexicana, S.A. de C.V.*, 629 F.3d 520, 523 (6th Cir. 2010)). "To guide that analysis, courts look to the private and public interests that the Supreme Court listed in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S. Ct. 839, 91 L. Ed. 1055 (1947)." *Id.*

### i. The public interest factors support dismissal

*Gulf Oil* instructs a district court to consider the following public interests: "the administrative difficulties of litigation in congested centers instead of the suit's place of origin, the burden of jury duty on citizens of communities with no relation to the case, the importance of trying the case in view and reach of others that may be affected, the local interest in having localized controversies decided at home, and the appropriateness of having trial at home with the law that governs the case." *Jones*, 920 F.3d at 1092 (citing *Gulf Oil*, 330 U.S. at 508–09).  The parties' briefing focuses on only three of the factors.  The Court will assess these three factors in turn below.

<u>The appropriateness of having trial at home with the law that governs the case</u>.  In their Motion to Dismiss, Defendants argue that "if this case remains here, the Court and parties will have to grapple with conflicts of laws and the application of foreign law." (Doc. No. 19, PageID #174.)  They assert that "sitting in diversity, this Court must resolve this dispute by applying Ohio's choice-of-law rules to determine which jurisdiction's laws govern each claim." (*Id.*)  They argue that "[r]egardless of the Court's resolution of those questions, [the fact] that such a complicated undertaking is necessary here itself weighs in favor of dismissal." (*Id.*)  Defendants then conduct a lengthy conflict of laws analysis and conclude that "English law would apply to each claim." (*Id.* at PageID #174–181.)

In their Opposition, Plaintiffs argue that "[t]he relevant question for the *forum non conveniens* analysis is whether the choice-of-law analysis will be too complicated for the Court to undertake." (Doc. No. 21, PageID #302.)  They argue that "the potential conflicts-of-law analysis in this case—

19

Ohio versus England—is not complicated." (*Id.*)  They assert that "Defendants present no reason why this Court is not equipped to handle the analysis of English law—as federal courts regularly do." (*Id.*)  Plaintiffs then conduct their own conflicts of law analysis to determine that Ohio law governs. (*Id.* at 302–04.)

In their Reply, Defendants argue that "[c]ontrary to Plaintiff's [sic] reading of the law, this Circuit favors dismissal on *forum non conveniens* grounds 'not just when a court has to apply foreign law, but also when the court 'would be required to *untangle problems* in conflict of laws.'"  (Doc. No. 25, PageID #653 (quoting *Jones*, 920 F.3d at 1094).)  Defendants then attempt to refute Plaintiffs' conflicts of law analysis.  (*Id.* at PageID #653–54.)

The need to apply foreign law weighs in favor of dismissal.  *Barak v. Zeff*, 289 F. App'x 907, 914 (6th Cir. 2008); *Dowling*, 727 F.2d at 615.  "The public interests favor dismissal not just when a court has to apply foreign law, but also when the court 'would be require to *untangle problems* in conflicts of law."  *Jones*, 920 F.3d at 1094 (quoting *Piper Aircraft*, 454 U.S. at 251) (emphasis in original).  Based upon the parties' briefing, the Court finds that it would be required to "untangle" problems in conflicts of law.  Accordingly, the Court finds that this factor weighs in favor of dismissal.  *Jones*, 920 F.3d at 1094; *Silva Cruz v. G LLC*, 464 F. Supp. 3d 906, 914 (E.D. Mich. 2020) ("The Court does not take a position at this time about which law should apply. But the fact that the Court will have to 'untangle' a substantial conflict-of-laws dispute weighs in favor of dismissing the action for *forum non conveniens*"); *H.K. Enterprises, Inc. v. Royal Int'l Ins. Holdings, Ltd.*, 766 F. Supp. 581, 584 (N.D. Ohio 1991) ("English law would apply even if the case remained in Ohio, and this Court is disinclined to 'untangle problems in conflict of laws, and in law foreign to itself'").

The local interest in having localized controversies decided at home.  In their Motion to Dismiss, Defendants argue that "England has the strongest local interest in the dispute surrounding the London Property and Defendants' alleged interference with the business relationships in England."  (Doc. No. 19, PageID #181.)  They assert that "Plaintiffs are English entities and Defendants' alleged misconduct was targeted at Plaintiffs and their business partners in England."  (*Id.*)  They further assert that "there can be no doubt that any alleged injury (expressed as damages in British Pounds) occurred in England."  (*Id.*)

In their Opposition, Plaintiffs argue that "[t]he Cleveland community unquestionably has a strong interest in adjudicating this dispute and holding [CCF], which holds itself out as a huge economic benefactor to the state, and its senior leaders, accountable."  (Doc. No. 21, PageID #301.)  They further argue that "Defendants cite no case where the place of injury dictates dismissal when the facts of the case are so obviously connected to the local forum and the local defendants."  (*Id.*)

In their Reply, Defendants argue that "[o]bviously, Defendants have a connection to Ohio[,] [b]ut Plaintiffs are domiciled and conduct business exclusively in England."  (Doc. No. 25, PageID #652.)  They further argue that "Defendants' business dealings in England are omnipresent."  (*Id.*)  Defendants assert "[t]he property underlining the entire deal is located in England; each individual defendant conducted significant business in England while negotiating the London Property; all third parties involved are in England; and the injuries alleged by Plaintiffs . . . occurred in England."  (*Id.*)

"The primary local-interest considerations are the parties' connections to the local forum and the location of the injury."  *Hefferan*, 828 F.3d at 500.  Here, Defendants have a strong connection to the local forum.  Defendants do not dispute that CCF's principal place of business is in Cleveland, and that each of the individual defendants reside in Ohio.  (Doc. No. 19, PageID #166.)

21

By contrast, Plaintiffs have a weak connection to the local forum, as both Fenton and 21 GP are English entities with principal places of business in London, England.  (Doc. No. 11 at ¶¶ 14–15.)  Further, none of Plaintiffs' equity holders are residents of Ohio.  (*Id.* at ¶ 16.)  Additionally, this case stems from a contract to purchase real property in England for use by CCL, an English entity.  (*See generally id.*)  Further, Plaintiffs allege that Defendants (i) tortiously interfered with their relationship with CCL (an English based entity), (ii) tortiously interfered with their contract with MeAg (an entity owning property in England, which Plaintiffs allege "is an important player in the European real estate market"), and (iii) tortiously interfered with their relationship with CBRE (an entity Plaintiffs allege is "a key player in the London market").  (*Id.*)  The only thing tying Plaintiffs to Ohio is their relationship with Defendants and one in-person meeting at CCF's offices in Cleveland.  By contrast, the Amended Complaint alleges numerous in-person meetings between CCF personnel and Fenton that occurred in England.  Furthermore, Plaintiffs have not alleged that their injuries occurred in Ohio and indeed, recognize and have contended that their injuries occurred in England.  In the anti-suit injunction action, Plaintiffs took the position that their "loss was suffered . . . in England."  (Doc. No. 23, Ex. 1 at ¶ 38.8.)

Upon balance, while recognizing that Defendants certainly have a presence in Ohio, the Court finds that the parties' connections, in this case, are more closely tied to England than to Ohio.

The burden of jury duty on citizens of communities with no relation to the case.  In their Motion to Dismiss, Defendants argue that "Plaintiffs have demanded a jury trial . . . but with small local interest in the dispute, it would be burdensome for an Ohio jury to hear and decide this case." (Doc. No. 19, PageID #182 (cleaned up).)  In their Opposition, Plaintiffs argue that "passing judgment on the brazen misconduct of the state's largest employer and three senior executives should be of

22

great interest to a Cleveland jury." (Doc. No. 21, PageID #302.)  In their Reply, Defendants argue "[b]ecause this case presents minimal, if any, interest to an Ohio jury, requiring it to adjudicate a dispute that is centered in England by applying English law—or worse, a mix of English and Ohio law—would be unfairly burdensome." (Doc. No. 25, PageID #654.)

The Court finds that this factor weighs in Plaintiffs' favor.  The Court finds that an Ohio jury would not be burdened with a case involving the Cleveland Clinic. *See Total Quality Logistics v. Cavendish Farms, Inc.*, No.1:09-cv-221, 2010 U.S. Dist. LEXIS 6052, at *16 (S.D. Ohio Jan. 26, 2010) ("Likewise, there would be no unfair burden for a jury located within the same state as [defendant] to adjudicate a dispute involving [defendant]").

In sum, two of the public interest factors weigh in favor of dismissal and one weighs in favor of keeping the case here.  The remaining factors will not be evaluated by the Court because the parties did not address them in their briefing.

### ii.   The private interest factors support dismissal

*Gulf Oil* instructs a district court to consider the following private interests: "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate in the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Jones*, 920 F.3d at 1092 (quoting *Gulf Oil*, 330 U.S. at 508).  The parties only dispute three of the factors, which the Court addresses in turn below.

Access to sources of proof.  In their Motion to Dismiss, Defendants argue that "[a]lmost all of the evidence that is potentially relevant to Plaintiffs' claims is located in England." (Doc. No. 19, PageID #182.)  Specifically, they argue that evidence related to Plaintiffs' damages is located in

23

England and that third-party witnesses are located in England.  (*Id.*)  They also argue that obtaining third-party discovery would be difficult if this case is not dismissed.  (*Id.* at PageID #183.)

In their Opposition, Plaintiffs argue that Defendants "do not show that it would be easier or less expensive to access [evidence] if the case were in London."  (Doc. No. 21, Page ID #305.)  They further argue that "[t]o the extent relevant documents are outside of the U.S. (though Defendants have not identified any), the 'advent of modern technology, including photocopying, scanning, and electronic document production,' reduces any barriers to access."  (*Id.* (citation omitted).)  Plaintiffs contend that "[t]hird parties are no different: Defendants have not stated what documents they will seek from third parties, if any, nor do they explain why the document production (if any) would be any less burdensome if the case were in England."  (*Id.* at PageID #305–06.)

In their Reply, Defendants argue that "Plaintiffs' Amended Complaint reflects that evidence in this case resides with parties and third parties in England."  (Doc. No. 25, PageID #654–55.)  They also argue that "[t]he availability of e-discovery would be the same regardless of forum— no less and no more if the case proceeded in England."  (*Id.* at PageID #656.)

The Court finds that this factor is a close call but weighs in favor of dismissal.  Defendants have not explained how it would be difficult or burdensome for Plaintiffs to produce documents from England to them in the United States.  Nor have Defendants explained why it would be easier, should the Court dismiss this case, for them to produce evidence in the United States to Plaintiffs in England.  Further, Plaintiffs and CCF are sophisticated business entities represented by sophisticated counsel.  Given the parties' level of sophistication, the Court finds that producing documents between the parties should be of no moment.

However, the fact that evidence is in the possession of third parties located in England leads this Court to conclude that this factor weighs in favor of Defendants.  Plaintiffs' Amended Complaint reflects that there will be relevant evidence in England.  Take Plaintiff's claim for Tortious Interference with Business Relationship with non-party, CCL (Count III) for example.  That claim alleges that Defendants interfered with 21 GP and CCL's business relationship.  Because CCL's relationship with 21 GP is at the heart of this claim, and CCL is located in England, there would certainly be relevant evidence in CCL's possession in England.  The same holds true for Plaintiff's remaining Tortious Interference claims: (i) Count IV (tortious interference with a contract with MeAg, an entity owning property in England, which Plaintiffs allege "is an important player in the European real estate market") and (ii) Count V (tortious interference with Fenton's relationship with CBRE, which Plaintiffs allege is "a key player in the London market.").  And it goes without saying that it would be easier for the parties to obtain evidence located in England through an English proceeding.  *See MGI Digital Technology S.A. v. Duplo U.S.A.*, No. 8:22-00979-DOC-KES, 2023 U.S. Dist. LEXIS 187336, at *5 (C.D. Cal. Aug. 24, 2023) (describing obtaining discovery in a foreign nation under the Hague Convention as "unduly time consuming and expensive").

Thus, because there will be some evidence located in England in the possession of third-parties, this factor weighs in favor of dismissal.

<u>Availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses</u>.  In their Motion to Dismiss, Defendants argue that, under the Hague Convention, "there is no ability to compel unwilling witnesses who reside in England to appear in the U.S."  (Doc. No. 19, PageID # 184.)  They further argue that even if these "third-party witnesses would volunteer to come to the U.S to testify, transportation costs would be enormous, far exceeding

25

the cost of obtaining their testimony in England." (*Id.*) They assert that "Plaintiffs have not identified any third parties located in the U.S." and that "CCF is willing to make its company witnesses available in England." (*Id.*)

In their Opposition, Plaintiffs argue that Defendants fail to meet their burden and "submit no evidence of difficulties with obtaining testimony from any witnesses—willing or unwilling—outside of Ohio." (Doc. No. 21, PageID, #306.) They assert that "[o]ther than naming a list of English (and non-English) firms that they believe may have relevant information, Defendants do not identify any individual witnesses or state whether those people would be unwilling to testify." (*Id.* at PageID #306–07.) Plaintiffs further argue that "while they claim that the cost to transport willing witnesses to Ohio would be 'enormous,' they do not identify any individuals who are willing to travel, their locations, the subject matter/relevance of their testimony, or the expected transportation costs." (*Id.* at PageID #307.) Plaintiffs also assert that "the cost of obtaining testimony from the few English third parties who may testify (though none have been identified)–would inevitably pale in comparison to the cost Defendants will incur to send their COO, CFO, head of U.S. real estate, CEO, and other members of the executive leadership team and Board to attend a trial in London." (*Id.*)

In their Reply, Defendants argue that "[c]ompelling unwilling English residents, such as third parties, to appear in the U.S. is doubtful at best" but that "if the case were in England, the parties would have greater access to local evidence and witnesses (including third-party witnesses who are already located there)." (Doc. No. 25.) Defendants further argue that they have met their burden by identifying "the topics that will be subject to discovery, identif[ying] potential witnesses in England . . ., consider[ing] the costs of discovery from the U.S., and examin[ing] the constraints that English law would place on any effort to conduct discovery in England." (*Id.* at PageID #658.)

26

The Court finds that it will likely to be difficult to procure witnesses regardless of where this case proceeds.  Based on Defendants' arguments, there are likely CCL employees based in England who would have discoverable information.  The parties would also need testimony from representatives of MeAg and CBRE who are also likely based in England.[4]  Conversely, Plaintiffs seek to obtain the testimony of several U.S. based CCF employees who are not named as defendants. (Doc. No. 24 at ¶ 4.)  These include, Tomislav Mihaljevic, M.D., selected members of CCF's executive leadership team, selected members of CCF's board of directors, and selected members of CCF's U.S.-based staff who were involved in the underlying negotiations.  (*Id.*)  Thus, there will be relevant witnesses residing out-of-jurisdiction no matter where the case proceeds.

Without deciding whether they can be compelled to testify by an English court, the Court, finds that the non-party CCF employees will be available to testify in England.  Defendants have represented to this Court that "CCF is willing to make its company witnesses available in England" which "would mean that all relevant parties and third parties would be available" in England.  (Doc. No. 19, PageID #184.)  Indeed, "Defendants have agreed, as a condition of dismissal, to produce any evidence and employees deemed relevant and admissible to liability by an English court deciding the case refiled there."  (*Id.* at PageID #183 (citing *Stewart*, 865 F.2d at 107 (affirming dismissal when the defendant "agreed, as one of the conditions imposed by the trial judge, to allow discovery of any evidence which would be discoverable under the Federal Rules of Civil Procedure, and to make witnesses under its control available to the Canadian court").)  Thus, resolving this dispute in England

---

[4] The Court rejects Plaintiffs' arguments that Defendants failed to meet their burden regarding this factor.  *See Dowling*, 727 F.2d at 615 ("The Supreme Court held in *Piper Aircraft* that a defendant is not required to detail all the witnesses likely to be used in a case in order to establish inconvenience. It is sufficient if the defendant provides enough information to enable the trial court to balance the parties' interests").

will be less burdensome because all relevant witnesses will be available to testify.  Accordingly, this factor weighs in favor of dismissal.

<u>All other practical problems that make trial of a case easy, expeditious and inexpensive</u>. Defendants do not address this factor in their Motion to Dismiss.  Plaintiffs, however, argue that this factor weighs against dismissal.  Specifically, Plaintiffs argue that if the Court dismisses this case, they would "re-file their Ohio claims in England, where an English judge would apply Ohio law." (Doc. No. 21, PageID #307.)  This, Plaintiffs claim, "would impose significant time and expense on Plaintiffs and Defendants."  (*Id.* at PageID #308.)  In their Reply, Defendants argue that "[t]he burden on an English court applying foreign law would be no greater (and no lesser) than the burden on this Court in applying foreign law" and that there is no reason to think that Ohio law would apply to this case in England."  (Doc. No. 25, PageID #658.)

For the following reasons, the Court finds that this factor weighs in Plaintiffs' favor.  The Court finds that regardless of where this case proceeds, the applicable court will be able to decide this dispute adequately either under Ohio law or English law, whichever ultimately governs.  The Court, however, recognizes the inherent delay to resolution of this dispute, and the additional legal fees the parties will incur if Plaintiff must re-file these claims in England.

In sum, upon careful consideration of the parties' arguments, and the evidence in the record, the Court finds that four of the six private/public interest factors in dispute weigh in favor of dismissal. The Court thus finds that, on balance, England is a more convenient forum and that trial in this Court would be unnecessarily burdensome for Defendants and the Court.

### 3. The amount of deference to give the plaintiff's choice of forum.

In their Motion to Dismiss, Defendants argue that Plaintiffs' choice of forum is owed little deference.  (Doc. No. 19, PageID #171.)  They argue that "the fewer connections to the U.S. a foreign plaintiff has, the less deference it receives."  (*Id.*)  Under this standard, Defendants assert that "Plaintiffs' connections to the U.S. are not just weak–they are virtually nonexistent."  (*Id.*)  They point out that "[b]esides a single meeting at CCF's home office in Cleveland, Plaintiffs have no connection whatsoever to the U.S." because Plaintiffs "are English companies," lack any Ohio equity holders, and are not "registered to do business here."  (*Id.*)  Based on these facts, Defendants accuse Plaintiffs of forum-shopping.  (*Id.* at PageID #172.)

In their Opposition, Plaintiffs argue that their choice of forum should be afforded deference.  (Doc. No. 21, PageID #293.)  They argue that "the Northern District of Ohio has substantial, *bona fide* connections to this case" because CCF "is the largest employer in the state, and Defendants Peacock, Laraway, and Rios live and work in this District."  (Doc. No. 21, PageID #293.)  They further argue that they are not forum shopping because this District "is the only forum where Plaintiffs could be guaranteed relief."  (*Id.* at PageID #294.)  And Plaintiffs assert that it is, in fact, Defendants that are forum shopping—not Plaintiffs.  (*Id.* at PageID #296–297.)

In their Reply, Defendants assert that Plaintiffs "argue that because they pled their claims under Ohio law, the case should stay in the U.S." (Doc. No. 25, PagID #643.)  Defendants also argue that they have not engaged in forum shopping because "[b]efore Plaintiffs filed this lawsuit, they had no ties to the U.S., and no court in the U.S. would have personal jurisdiction over them."  (*Id.* at PageID #646.)

The Sixth Circuit has provided guidance on the level of deference a foreign plaintiff's choice of forum should be given:

> Normally, "it makes sense to defer to a plaintiff's choice of forum based on an assumption that the plaintiff knows its self-interest better than anyone else and thus will choose a convenient forum." *Id.* at 660 (cleaned up). Deference is best viewed as a sliding scale. *Solari v. Goodyear Tire & Rubber Co.*, 654 F. App'x 763, 766 (6th Cir. 2016). And a foreign plaintiff like IMSS receives less deference to its choice of forum. *Prevent USA Corp.*, 17 F.4th at 660-61; *see also Hefferan*, 828 F.3d at 493 ("[A] foreign plaintiff's forum choice is usually accorded less deference because the assumption of convenience is 'much less reasonable.'"). IMSS chose not to litigate in its home forum. In such a case, the "convenience [of the forum] cannot be presumed[.]" *Stewart v. Dow Chem. Co.*, 865 F.2d 103, 106 (6th Cir. 1989).

*Instituto Mexicano Del Seguro Soc. v. Stryker Corp.*, 28 F.4th 732, 737 (6th Cir. 2022).  A foreign plaintiff's choice-of-forum, however, can still be afforded some deference:

> That a plaintiff's ties to the United States are weak—or even nonexistent—does not automatically mean that her choice of forum is owed little to no deference. A foreign plaintiff may decide to file suit in the United States because of "a legitimate reason such as convenience or the ability to obtain jurisdiction over the defendants rather than tactical advantage." A foreign plaintiff might logically believe that a U.S. forum is the most "convenient" location in which to file her case if she doubts that any other court would be able to exercise jurisdiction over the defendant. In such a case, the deference owed to her choice of forum would increase.

*Associação Brasileira de Medicina de Grupo v. Stryker Corp.*, 891 F.3d 615, 619 (6th Cir. 2018) (internal citations omitted).  But even if a "legitimate reason" is identified, the "presumption of convenience applies with less force" for foreign plaintiffs."  *Id.*

Because Plaintiffs are foreign entities, they receive "less deference to [their] choice of forum." *Stryker Corp.*, 28 F.4th at 737.  Upon careful review of the parties' arguments, and authorities cited in support, the Court finds that Plaintiffs have not established "a legitimate reason such as convenience or the ability to obtain jurisdiction over the defendants rather than tactical advantage" to allow the Court to defer to its choice-of-forum.  *Id.*  First, the court has already determined, after

weighing the public and private interest factors, that England is a more convenient forum.  Second, while Plaintiffs may have had legitimate fears that this Court "is the only forum where Plaintiffs could be guaranteed relief," the Court has found that England is an available and adequate forum. *See Martinez-Porte v. Multi-Color Corporation*, No. 23-3971, 2024 U.S. App. LEXIS 18258, at *12–13 (6th Cir. July 23, 2024) ("With Martinez-Porte's primary reasons for choosing venue in Ohio having fallen away, the 'assumption that a United States court is most convenient ... does not hold true.'") (quoting *Jones*, 910 F.3d at 1095).  Thus, the Court finds that Plaintiffs' choice of forum is not entitled to deference.

In sum, after considering the parties' arguments, weighing the evidence submitted in support thereof, and applying Sixth Circuit precedent, the Court finds that (1) England is an available and adequate forum; (2) upon balance of the private and public interest factors it would be unnecessarily burdensome for Defendants to litigate the instant action in this Court; and (3) Plaintiffs' choice of forum should be afforded little deference.  Accordingly, in the exercise of its discretion, the Court grants Defendants' Motion to Dismiss, subject to the conditions set forth below.

## V.  Conclusion

For the reasons set forth herein, Plaintiffs' Motion for Leave (Doc. No. 26) is GRANTED and Defendants' Motion to Dismiss (Doc. No. 19) is GRANTED, as set forth herein.  The proposed Sur-Reply attached to the Motion for Leave is deemed filed as of May 29, 2025.  Plaintiffs Amended Complaint is dismissed without prejudice.  Dismissal is conditioned upon the following terms: (1) Defendants shall consent to, and shall not challenge, service and jurisdiction in England; (2) in the English proceeding, Defendants shall produce to Plaintiffs any evidence in their possession, custody, or control that is located in the United States and is discoverable under English law; and (3) in the

English proceeding, Defendants shall, at their cost, make their employees that are relevant to this dispute, as determined by English law, available, to testify at trial or at any other applicable proceeding.  Plaintiffs shall have the right to refile this action if Defendants fail to abide by the preceding conditions or if the English court determines that it lacks jurisdiction over Defendants regarding this dispute.

**IT IS SO ORDERED.**

*s/Pamela A. Barker*
PAMELA A. BARKER
Date:  October 27, 2025                                  U. S. DISTRICT JUDGE

32